# THE STATE OF IOWA;

IOWA CITY, JUNE TERM, A. D. 1856,

In the tenth year of the State.

PRESENT:

HON. GEORGE G. WRIGHT, CHIEF JUSTICE.
" WM. G. WOODWARD, } JUSTICES.
" L. D. STOCKTON, }

## McManus v. Carmichael.

Although the ebb and flow of the tide was, at common law, the most usual test of navigability, it was not necessarily, the only one.

But however this may be, that test is not applicable to the Mississippi river.

The common law consequences of navigability, attach to the legal navigability of the Mississippi.

The term *navigable*, embraces within itself, not merely the idea that the waters could be navigated, but also the idea of publicity, so that saying waters are public, is equivalent, in legal sense, to saying that they are navigable.

Yet the navigability, in fact, is the leading idea, and is the ground of their publicity.

The ebb and flow of the tide does not, in reality, make the waters navigable, nor has it, in the essence of the thing, anything to do with it.

It is navigability *in fact*, which forms the foundation for navigability *in law*, and from the *fact*, follows the appropriation to public use, and hence its publicity and legal navigability.

VOL. III.                    1

The real test of navigability in this country, is ascertained by *use*, or by public act or declaration.

The acts and declarations of the United States declare and constitute the Mississippi river a public highway, in the highest and broadest intendment possible.

The rule that a grant is to be construed most strongly against the grantor, does not apply to public grants.

The government being but a trustee for the public, its grants are to be construed strictly.

Grants of land by the United States, by patent, have relation to the survey, plats, and field notes.

The common law knows but two lines—the *medium filum aquæ* and high water. If the stream be navigable, the boundary of the adjoining land is the one; if not navigable, the boundary is the other.

By the common law, the riparian proprietor on navigable waters, owns to high-water mark only, and this rule applies to the Mississippi river.

### Appeal from the Scott District Court.

THIS was an action of trespass, for taking two loads of sand from the soil of the plaintiff, McManus. The *locus in quo* is in Scott county, and in the Mississippi river. The river, at this part of it, and for nearly thirty miles, runs nearly from east to west. In the middle of the river is Credit island, containing about two hundred and sixty acres. Between Credit island and the main land, on the north, or Iowa side, is a very small island, called Crane island, containing about seven acres. Off the east end of Credit island (it being up stream), is Pelican island, containing about eleven acres. The positions of these islands are represented on the annexed plat.

In 1837 or 1838, the United States surveyed, and in 1840 sold, the public lands in Scott county. They surveyed the main land and Credit island, but did not survey the other two small islands, which overflowed; and which are now called Crane and Pelican. The main land on the Iowa or north side, opposite Pelican island, and the *locus in quo*, was sold to E. Cook, and Credit island to A. H. Davenport. At a subsequent date, Crane and Pelican islands were surveyed, and the latter sold to the plaintiff by patent, dated April 10th, 1849, in which the description is as follows:

"Lot number three and Pelican island, of section three, in township seventy-seven, north of range three, east of the fifth principal meridian, * * * according to the official plat of the survey of the said lands returned to the general land office of the Surveyor-General," &c. At the east or upper end of Pelican island, is a *sand-bar*, which is exposed at low water, and which is the *locus in quo*. From this sand-bar, between high and low-water mark, the defendant took two boat-loads of sand, taking it from the outside of the meanders of the survey by the United States. The whole island is subject to overflow at unusually high water.

The plaintiff has no other possession than a constructive one, arising from title, if he has this; and the object of this suit is to try his title to the sand-bar, outside of the lines of the survey, between high and low water, up stream. The court found for the plaintiff, and judgment was rendered in his favor, from which the defendant appeals.

*Whitaker & Grant*, for the appellant.

There are two propositions which we advance in relation to the riparian ownership of lands on the Mississippi, one of which must be true; and if either is, the plaintiff cannot recover in this action.

*First.* That the Mississippi river is a navigable stream; and as a corollary from this, that its bed belongs to the public, and the plaintiff has no right of exclusive possession and ownership beyond the lines of his survey, between high and low-water mark.

*Second.* If the Mississippi river is not navigable, in the supposed common law sense of that term, then the riparian owner of the bank owns to the centre of the stream; and the government, having conveyed the bank, have also conveyed the whole land, to the middle thread of the stream, and the plaintiff could acquire no title by a subsequent survey and sale to him.

1. There are many dicta, both in the text-books and judicial decisions in the United States, that the word "navigable," when applied to a river, means a river where the tide

ebbs and flows, and that in such rivers only the soil belongs to the public; whereas those large fresh water streams which are navigable in fact, are not navigable in law, and the public have only an easement in them, subject to the rights of soil in the riparian owner. See Angell on Tide Waters, 75. "It is a settled principle," says Kent, "in the English law, that the right of soil of the owners of land, bounded by the sea, or in navigable rivers, where the tide ebbs and flows, extends to high water, and the shore below common, but not extraordinary, high-water mark, belongs to the state, as trustee of the public; but grants of land, bounded on rivers, above tide water, carries the exclusive right and title of the grantee to the centre of the stream, unless the terms of the grant clearly show otherwise, and where such river is navigable for boats and rafts, the public have an easement therein." 3 Kent, 521; citing *Rex* v. *Smith*, Douglass, 425; 3 Caines, 318; *The River Banne*, Davies, 152.

This proposition, which has followed the words of the Irish reporter, Davies, is a mere *dictum*, and there is, in fact, no such common law rule, as we will now show, by reason and authority. The other English reports lay down no such doctrine, nor does Lord Hale. Woolrych, in his very able treatise on the Law of Waters, gives the following definition of a public or navigable river: "Rivers are either public, as where there is a common right of navigation exercised, and then *the soil* is in the king, as the lord of the manor; or private, where the soil is the property of the individual who owns the land on both sides, or of each proprietor, *ad medium filum aquœ*, where the same is not the owner of the shore on either bank." "A public navigable river frequently owes its title to be considered as such, from time immemorial, by reason of its having been an ancient stream, but very many acts of Parliament have been passed, to constitute those navigable rivers which were not so before. Waters flowing inland, where *the public* have used to exercise a free right of passage, from the time whereof the memory of man runs not to the contrary, or by virtue of legislative enactments, are public navigable rivers. This is the most un-

McManus v. Carmichael.

failing test to apply, in order to ascertain a common right. Others have attempted to apply other tests, and frequently without success. Thus, it has been said, that in the case of a river, which flows and reflows, and is an arm of the sea, it is *prima facie* common to all (HOLT, J., 1 Modern, 105); and upon the strength of this position, it was urged on one occasion, that an action could not be sustained against the corporation of Lynn, for the non-repair of a certain creek, because the tide of the sea had been accustomed to flow and reflow therein, &c.; but this argument was treated by the court as a fallacy; for they denied that the flowing and reflowing of the tide constitute a navigable river, there being many places where the tide flows, which are not navigable." *Lord Mayor of Lynn* v. *Turner*, Cowper, 86. Mr. Justice BAILEY said that the *prima facie* evidence of the flux and reflux of the tide, depends on the situation and nature of the channel. If it is a broad, deep channel, calculated for the purposes of commerce, it would be natural to conclude that it had been a public navigation. *King* v. *Montague*, 1 E. C. L. 418; 4 Barn. & Cres. 602. A river has been defined to be a running stream, pent in on either side with walls and banks. Woolrych on Waters, 40. "Banks of rivers contain the river in its natural channel when there is the greatest flow of water." 13 Howard, 391. "When banks of rivers are spoken of, those boundaries are meant which contain their waters at the highest flow, and in that condition they make what is called the bed of the river. Rivers have banks, shores, waters, and a bed; and the water line in the bed of a river, on either side of it, may be distinguished upon every stage of its water, high or low, at its highest or lowest current. It neither takes in overflowed land beyond the bank, nor includes swamps or low grounds liable to be overflowed, but reclaimable for meadows or agriculture." *Howard* v. *Ingersoll*, 13 Howard, 415. "By the civil law, all rivers in which the flow of waters was perennial, belonged to the public, and the public right extended to the use of the banks, as well as to fishing. Navigable rivers, in the language of the civil law, are not merely rivers in which

the tide ebbs and flows, but rivers capable of being navigated in the *common sense* of the term. In the words of the digests, *statio itur re navigatio.* Angell on Tide Waters, 79. On another occasion, in this court, we called in vain for any statute establishing the common law in Iowa.

Are we to be told that the Mississippi river is not a navigable stream, and its bed private property? The father of the floods, private property! The great river, to see which the conqueror of Florida periled the lives of his followers, to find for himself a grave in its waters, instead of gold in its sands, belongs to every petty owner who pays a dime for the land on its banks! The river, which carries to the sea the products of millions of people, the boundary of states without number; which carries to a single port commerce numbered by hundreds of millions of dollars, and numbers the ships which float on its waters by thousands, cannot be private property. We know that men, with the wealth of Crœsus, and the genius of Archimedes, have spanned its waters with a bridge. So has science bridged and tunneled the Thames, at London, and the thundering car has swept across the straits of Menai, and Niagara at the falls; but they are navigable streams, and the father of waters has yielded to the genius of progress, not to diminish, but increase, the trade and intercourse on this great highway of the republics which have grown, and will continue to grow, on its borders.

As to the principle, whether any of the great inland rivers of America, with their beds below high-water mark, belong to the public, it would be useless for us to deny that the courts of the states are very much divided. All of them, without exception, have mistaken the common law rule. Some of them have had the good judgment to apply to them the common sense rule. In the following states, the doctrine has been held, that the riparian proprietor on our great inland rivers, owns to the middle of the stream:

New York. The cases here have been somewhat conflicting, but have ultimately settled in favor of the *ad filum medium viæ.* Angell on Water Courses, 562; *Palmer* v.

McManus v. Carmichael.

*Mulligan*, 3 Caines, 307; 10 Johns. 236; 17 Ib. 15; 20 Ib. 90; 6 Cowen, 518; 5 Wendell, 423; 13 Ib. 355; 5 Paige, 137; 9 Ib. 547; 17 Wendell, 574; 26 Ib. 404.

Massachusetts. 17 Mass. 298; 1 Pickering, 180; 5 Ib. 199; 20 Ib. 186; 5 Ib. 492. Bank boundary limits to bank and excludes the stream. *Jackson* v. *Hathaway*, 17 Mass. 288.

New Hampshire. 3 New Hamp. 321; 9 Ib. 461; 2 Ib. 369.

Missouri. *O'Fallon* v. *Daggett*, 4 Missou. 343. In this cause, the court decided that the riparian right extended to low-water mark, because the king of Spain had made an express grant to Yosti, to low-water mark.

Maine. 3 Greenleaf, 269; 7 Ib. 273; 8 Ib. 138; 2 Fairfield, 278.

Connecticut. 2 Conn. 48; 9 Ib. 38; 7 Ib. 186; 8 Ib. 231.

Maryland. *Brown* v. *Kennedy*, 5 Harris & John. 195.

Virginia. The cases conflict. There is a case in Randolph looks one way, and a case in Call the other.

Ohio. *Gant* v. *Chambers*, 3 Ohio, 495; 11 Ib. 31; 16 Ib. 540.

Indiana. 3 Blackford, 193.

Illinois. *Middleton* v. *Pritchard*, 3 Scam. 500.

Mississippi. *Morgan* v. *Reading*, 3 Smedes & M. 306. The cases in Illinois and Mississippi are by far the ablest on this side of the question, and are highly commended by Kent. We think the argument of Depew, counsel, in favor of the high-water line, more able than Judge SHARKEY's opinion on the other side.

On the other hand, the following states hold to the reverse of this doctrine, and that the bed of the stream belongs to the public. In some cases they limit at low water, but that limitation is in consequence of the words of the grant or legislative enactment.

Pennsylvania. *Carson* v. *Blazer*, 2 Binney, 475; *Shunk* v. *Schuylkill Manf. Co.*, 14 Sergeant & Rawle, 71; 9 Watts, 228; 8 Ib. 434.

North Carolina. 2 Devereux, 30; 3 Ib. 59; *Collins* v. *Benbury*, 3 Iredell, 281; 5 Ib. 118.

South Carolina. *Cotes* v. *Waddington*, 1 McCord, 581.

Tennessee. *Elder* v. *Barnes*, 6 Humphrey, 358.

Alabama. *Brittock* v. *Wilson*, 2 Porter, 336; *Major* v. *Erolara*, 9 Ib. 577.

Michigan. *Laplaisance Bay Co.* v. *Munroe*, 1 Walker, 155. This case takes the most rigid view of any yet cited. It takes the ground that the party only purchases to high water, and he is limited by his grant.

Iowa. *Moffitt* v. *Brewer*, 1 G. Greene, 348.

United States. *Bowman* v. *Walker*, 2 McLean, 376; *Pollard* v. *Hogan*, 3 Howard, 212; *Goodtitle* v. *Kibbe*, 9 Ib. 471; *Propeller Geneva Chief* v. *Fitzhugh*, 12 Howard, 453; *Howard* v. *Ingersoll*, 13 Ib. 381.

The authorities on the "navigable" side of this question, all take the ground that the quality of the water can make no difference as to its capacity to float a ship; and that where the stream is navigable, its bed, which includes all between ordinary high-water mark, belongs to the public. The opinion of Judge McLEAN, with a full knowledge of the Ohio decisions, should have great weight.

The Mississippi river has been declared to be navigable in the treaties with France and Spain, and various acts of Congress. See 8 Laws U. S. 140; 3 Ib. 349, 543; 2 Ib. 642, 703, 747. There is, however, another authority in favor of this view of the case, which admits of no doubt. The cases in 1 Walker, 155, and 1 G. Greene, 348, are based on the acts of Congress in relation to surveys and sales of the public lands. The acts of Congress provide, that when the streams on the public lands are navigable, they are public highways—they belong to the public; and where they are not navigable, instead of the common law rule of ownership to the middle of the stream, that it shall be common to both. Gordon's Digest, 360; 1 U. S. Laws, 468, 491; 2 Ib. 299, 358; 5 Ib. 743. The acts of Congress above referred to, are extended to the state of Iowa. 5 U. S. Laws, 243. When the United States survey a navigable stream, they survey

McManus v. Carmichael.

and sell only to the top of the bank. How can the purchaser own beyond his grant, into the water, either to low water, or the centre of the stream? This statute means something more than a mere easement in the land of navigable waters, viz: that the public had the easement without reservation. It is true, we have not been able to impress on the court below, or the counsel on the other side, that this act establishes and limits the ownership of streams. It is often a convenient way to parry the force of a blow, to inquire who struck it. If the act of Congress intended that ownership should extend to the middle of a navigable stream, why do they not survey and sell it? What else can the act mean? Suppose A. sells B. a tract of land, reserving eighty feet on the south side, for a street forever: will any man say that in such case B. owns to the middle of the street, or any part of it.

But the court may ask, why do we wish to limit the ownership on navigable waters to high-water mark? The 3 Kent, 523; *Middleton* v. *Pritchard*, 3 Scammon, 510; *Morgan* v. *Redding*, 3 Smedes & Marshall, 306, give the riparian owner to the centre, and, of course, all the intervening islands. *Deerfield* v. *Arms*, 17 Pickering, 41, and *Adams* v. *Frothingham*, 3 Mass. 352, decide this cause in favor of the defendant. The United States surveyed and sold the shore and Credit island, and if the common law rules under our interpretation, prevail, the title to the land in controversy belongs to Ebenezer Cook, and not the plaintiff. If the riparian ownership on the Mississippi river is not limited to high-water mark, then the ownership must extend to the medial line, and whoever buys the shore, buys all the islands not then surveyed, and by such survey shown to be reserved and sold separately. *Middleton* v. *Pritchard* is good law, if the Michigan decisions are not. In those states where the line goes to low-water mark, it is so made by the act of the legislature (see HALL's opinion in 2 Devereux, 30, citing the act of the North Carolina legislature), or by the terms of the grant, if the shore, as in 4 Missouri. There is no rule of interpretation of a grant, which admits of an

extension to low water, neither by the common law nor the civil law.

But how can the plaintiff claim, north of his line, up stream. If his doctrine be true, if the sand-bar in low water extended to St. Peters, he would own it. No matter which rule this court adopts, the plaintiff has no title to the sand-bar between high and low-water mark, outside his survey. The doctrine of alluvion and accretion does not apply to any such case. Alluvion and accretion allude to the increase of the land, placing it above high-water mark, adding to the land above water. A man has no more right to call the shore between high and low-water mark, alluvion or derelict, than he has to call the sea shore or sands, between the ebb and flow of the tide. When islands are formed in navigable waters by the deviation of the water, or by the collection and aggregation of sands and other substances, they belong to the state. Angell on Tide Waters, 267. Alluvion is when the sea, by casting sand and earth, increases the land by degrees, which consequently *protrudes* itself out further than its ancient bounds. Woolrych on Waters, 34, margin; Angell on Tide Waters, 43, 52.

It is claimed in 3 Smedes & Marshall, 306, that the public have only an easement in the river, as a highway. Now, in highways of any kind, where the sovereign has sold the land, and in right of eminent domain, takes a highway as an easement, when the road ceases, the land reverts. The case is different where the fee has never been out of the sovereign; as for instance, where the sovereign sells by metes and bounds, reserving eighty feet wide for a highway. It is nonsense to talk about an easement in the eighty feet. An easement is a right to pass over another's soil. One cannot have an easement in his own soil. In the Mississippi river the fee never was out of the sovereign. It was declared and made a highway before the grant. If an island spring up in it, or its channels go dry, they belong to the sovereign, because the fee never has been anywhere else. How would it be in the Albemarle sound, or Chesapeake bay, where there is no tide?

McManus v. Carmichael.

The patent calls for the land by the survey, by the field notes. The government never measures and sells the fee of the soil of navigable rivers.

*Cook & Dillon*, for the appellee.

We shall endeavor to establish the following propositions:

1. That the *alluvion* of banks and islands belongs to the riparian proprietors, whether outside of the meanders of the official surveys or not. Angell on Water Courses, §§ 53, 54, 55. The doctrine of the civil law is this: "That ground gained on a river by alluvion, or imperceptible increase, belongs to the owner of the adjoining land, *jure gentium*. 3 Kent's Com. (7th ed.) note to 519, citing Just. Inst. 2, 1, 28; Dig. 41, title *De. Æq. Rer. Dom.* 7, 1; Puff. 4, 7, 12. This is the common law, also. Bracton, book 2, chap. 2; Hale's *De Jure Maris*, c. 6; 2 Black. Com. 261; *King* v. *Yarborough*, 3 Barn. & Cres. 91; 1 Dow. (N. S.) 178, *S. C.; New Orleans* v. *U. S.*, 10 Peters, 662; Schultes on Aquatic Rights, 115, 118; *Deerfield* v. *Arms*, 17 Pick. 41; 2 Public Land Opinions and Instructions, 758, also 850; 3 Scam. 522, as to ownership of alluvion. Pelican island, since its survey in 1846, has considerably increased in size, from gradual growth and deposit; but perhaps, in the next nine years, it will diminish in size as much, or more, than it has increased during the last nine. It is admitted that the sand was taken by the defendant, between high and low-water mark, off of said island, but he claims that this is outside of the meanders of the original survey. Suppose it is: that does not make the growth of the island the defendant's. It was originally meandered along the water, and if the island should grow to twice its size at the time of the survey, it would still be the property of the plaintiff, and it would be no defence for the defendant to set up, that he took the sand outside of the meanders of the original official survey. This is too plain to require argument. If sea weed be cast upon the sea shore by slow degrees, it belongs, as marine increase, to the riparian proprietor. Angell on Tide Waters, 260; *Emans* v. *Trumbull*, 2 Johns. 322; cited and approved in *Phillips* v. *Rhodes*,

McManus v. Carmichael.

7 Metcalf, 322. Sand or sand-bars connected with the main land, come under the designation of *alluvion*, or *batture*. "Batture is a marine term, and denotes a bottom of sand, &c., rising above the surface of the river." 3 Kent, 519 (top) note a, which refers to and reviews the decisions of the Louisiana courts (where there has been much litigation in reference to alluvion and battures), and where the law has been well, and we think, properly settled. In cases of "islands," especially, the owner ought to be entitled to the *protection* which is afforded by alluvial formations.

If the plaintiff's patent in this case conveys any title to him to the "island," then, by the law, he is entitled to the protection of his grant by the gradual growth and increase. And shall the defendant, a mere intruder, have *legal* liberty to remove the only barrier which preserves the island, and keeps it from being washed or swept away? If, then, the plaintiff in this case is, on other grounds, entitled to recover, the fact that the defendant took the sand *outside of the meanders of the survey*, or from the *batture* or *alluvion* of the island, does not defeat the plaintiff's right of recovery.

2. We shall endeavor to show, that riparian proprietors on the Mississippi river own to low-water mark. We are well aware that in reference to this proposition, there is some conflict of judicial decision; but we trust to be able to show the court, that *both reason* and *authority* are in favor of the proposition, as we have announced it; or, at least, that there is such a conflict, as that this court will be at liberty to make an *independent and sensible* decision of this important question. In *McCulloch* v. *Aten*, 2 Ohio, 307, it is held, that "A boundary, with the meanders of a stream, is the water's edge *at low-water mark*," citing 5 Wheat. 374. In 11 Ohio, 143, it is said that grants on rivers, above tide water, carry the *exclusive* right of the grantee to low-water mark, or, as some of the authorities say, to the centre of the stream." 16 Ohio, 540, teaches the same doctrine. Owners of land on the Ohio go to low-water mark. 4 Blackf. 285; 3 Ib. 194; 5 Wheaton, 374. The case in 2 Porter (Alabama), 436 (cited in 3d Kent, 522, note), repudiates the common law as

to *test* of navigability.   6 Tennessee, 358 (cited in 3 Kent, 523, note), is the same as Alabama and North Carolina.   1 McCord (South Carolina), 580, contains the same doctrine. 2 Devereux (North Carolina), 30, same doctrine; affirmed in 3 Iredell, 285.   The Pennsylvania decisions are numerous, and well considered: we cite the following: *Hart* v. *Hill*, 1 Wharton, 131, which holds that "the owner has the right, and sole right, to. quarry or take gravel above low-water mark," and this too in a *navigable* stream, although he only *owns* to high-water mark.   In *Naylor* v. *Ingersoll*, 7 Barr, 185, it is said that riparian owners. on navigable rivers, have the right to extend their wharves to *low-water mark*.   In England and this country, the space between high and low-water mark, on a navigable stream, belongs to the owner of the adjacent soil.   See *Carson* v. *Blazer*, 2 Binney, 475, as to low-water mark; *Cooper* v. *Smith*, 9 Serg. & Rawle, 32; 14 Ib. 74.   Owners adjacent to large rivers, do not own to the centre of the stream.   Iowa Legal Inquisitor, March, 1853, 65, containing the recent case of *Frankford* v. *Lennig*. *Handless* v. *Anthony*, 5 Wheat. 375, is a leading case, and urges the reasons in favor of *low*-water mark.   We come now to 16 Peters, 261, and 2 Howard, 592, the latter relating to the Mobile case ; but after a careful examination of these cases, we find no principle asserted adverse to the plaintiff's right to recover in this case.   In Massachusetts, the colonial ordinance of 1641 extended the title of riparian owners to low-water mark, and though the ordinance was limited to Plymouth colony, and afterwards annulled, yet the doctrine of it is held in Massachusetts and Maine to be part of the common law of those states.   *Storer* v. *Freeman*, 6 Mass. 438; *Lapish* v. *Bangor Bank*, 8 Greenl. 85; 3 Kent Com.(7th ed.) 522.   In *East Haven* v. *Hemingway*, 7 Conn. 186, it is held that the owners of land adjoining a navigable river, have an exclusive right to the soil between high and low-water mark, for the purpose of erecting wharves and stores ; but 9 Conn. 38, decides that such owner was not entitled to sea-weed which grew below low-water mark.   It is there said, however, that on navigable waters, "the ad-

joining proprietors have the right of the shore, subject to the paramount right of the public.· On the death of the owner to high-water mark, his estate on the shore and erections upon it, descend to his heirs." And in 7 Conn. 203, it is said that, "the right of individuals to the use of the soil of the shore, subject to the paramount rights of the public, so far as my information extends, has never until now been disputed." The same doctrine is held in *Nichols* v. *Lewis*, 15 Conn. 143, 2 McLean, 382. In *Bowman* v. *Walthen*, 2 McLean, 382, it is said that, "the common·law doctrine can have no applicability to this country, where the fact of navigableness does, in no respect, depend upon the ebb and flow of the tide;" and that, "the riparian right on the Ohio extends to the water, and no supervening right can be maintained or exercised over any part of this space, without the consent of the proprietor." This case was affirmed by the United States Supreme Court, in 1843.

Even if the Mississippi is navigable, the ownership of the soil to low-water mark, is in the proprietor of the adjoining bank, at least as against trespassers. 2 Smith's Leading Cases, 193; citing *Hart* v. *Hill*, 1 Wharton, 124; *Ball* v. *Slack*, 2 Ib. 508; *Freeling* v. *Powell*, 1 Wheat. 528; *Holmes* v. *Richards*, 4 Call, 441; *Mead* v. *Hayes*, 3 Randolph, 33; *Arnold* v. *Lundy*, 1 Halstead, 11; *Asby* v. *R. R. Co.*, 5 Metcalf, 368; *Jones* v. *Jauncey*, 8 Watts & Serg. 436; *Chapman* v. *Kimball*, 9 Conn. 38; 7 Ib. 156; 3 Grattan, 655; *Ingram* v. *Wilkinson*, 4 Pickering, 268; *Bullock* v. *Wilson*, 2 Porter, 448; 4 Har. Dig. 2938; 9 Wend. 571; *Blundell* v. *Catterall*, 5 B. & Adol. 268; *S. C.*, 7 Eng. C. L. 9. We wish to call the attention of the court to another significant fact, in this connection: That there never has been a decision made in the United States, by which the riparian owner has been limited to high-water mark. Some hold that he owns to the centre of the stream; some that he owns to low-water mark; but none that he only goes to high-water mark. Low-water mark is the boundary universally adopted in this country, as the boundary of grants upon lakes. Angell on Water Courses, § 41. Why not apply same rule to rivers?

McManus v. Carmichael.

3. We shall endeavor to show that this island belongs to the plaintiff, by virtue of his patent, and does not belong to the riparian owner on the main shore. The leading case to support the doctrine that islands in the Mississippi belong to the riparian owner, is the case of *Middleton* v. *Pritchard*, 3 Scam. 510. All that part of this decision relating to islands is *dicta*, as the question before the court did not relate to islands. The decision of that particular case is right, perhaps; the *dicta* of the court on the ownership of islands, are *dicta*, not law. We ask particular attention to the "dissenting opinion" of Justice WILSON, and submit to this court that his is the best reasoned opinion. We read it as containing a brief, but lucid, review of the mode of disposition of the public lands by the United States. If the riparian owner (on the main shore) owns Pelican island, he owns it not so much by his patent, as in spite of his patent. His patent only calls for land (a certain quantity) on the main shore; that is what he buys, and that is what he gets. But, say the gentlemen, he also gets, as an incident to his grant, a large island a long distance from the shore. See the objections of Justice WILSON, in 3 Scam. 510, as follows: 1. Want of authority to give grants so extensive an operation; 2. The understanding and intention of the parties in such cases; 3. The constant practice of the United States in selling these islands. In *Child* v. *Starr*, 4 Hill, 382, it is held that, "the soil of a river does not follow as an incident or part of the subject matter, *usque filum aquæ*." "Land cannot be incident or appurtenant to land. The conveyance of one acre can never be made to carry, by any legal construction, another acre, by way of incident or appurtenance to the first," &c. This case was an appeal from 20 Wend. 149 *et seq.* And in 15 Johns. 447, it is said that it is absurd to allow the fee of one piece of land, to pass as appurtenant to another tract. Grants are to be taken most favorable to the sovereign; but in private grants, they are to be taken most strongly against the grantor. This is an important distinction, and which will go far to harmonize many conflicting decisions on riparian rights. *Middleton* v. *Pritchard*, 3 Scam

522; 2 Black. Com. 347; 2 Gill, 227; 6 Peters, 737. Public grants are to be strictly construed, and nothing passes by implication. 11 Peters, 420. *Jackson* v. *Lampire*, 3 Peters, 289; *Beatty* v. *Knowles*, 4 Ib. 163; *Bank* v. *Billings*, 4 Ib. 514; 1 Walk. Chan. (Michigan) 169; 3 Kent Com. (7 ed.) 432. Grants by the public, are to be construed against the grantee. Sir William Scott has vindicated such a construction as founded in wise policy; for such grants are made by a trustee for the public, and no alienation should be presumed not clearly and indisputably expressed. 7 Johns. 8. The government is never presumed to grant the same land twice. 6 Peters, 737. In view of the acts of Congress, there is an implied exception of the bed of a fresh water river beyond low-water mark, in all grants by the government. 2 Porter (Ala.), 436; cited in 3 Smedes & Marshall, 206.

The United States cannot sell a foot of land anywhere, until it has been surveyed and ordered into the market for sale by the proper authorities. No authorities need be cited on this point. Until sold, the title is in the United States. The government is not bound to survey all their lands at once. They may survey half a township, and leave the balance, or they may survey the main shore, and leave all the islands unsurveyed. Suppose Rock island or Credit island had not been surveyed, would they have passed to the riparian proprietor? Will the mere omission of a deputy surveyor, from any cause, to survey an island when he surveys on shore, prejudice the United States? Does his neglect operate to deprive the United States of all islands that he may, by accident or design, omit to survey? See letters from commissioner general land office, and act of Congress, 1839, making special appropriation for the survey of unsurveyed islands. Our positions, in short, are these: 1. That the common law test of navigability or navigableness, does not apply to the Mississippi river. *Bowman* v. *Mather*, 2 McLean, 382; 2 Devereux, 34; 20 Wend. 149; 2 Binney, 475; 1 Walk. Chan. 168; 12 Howard, 454. And if so, then policy, convenience, and good sense dictate, that riparian owners should own, or at least against trespassers, con-

McManus v. Carmichael.

trol, down to low-water mark. "On fresh water rivers, high-water mark should never be the boundary between either states or individuals." 13 Howard, 423.

2. That the Mississippi is a navigable stream. See U. S. Laws, 57, 83, 140; Law of 1783; and so declared by treaties; Constitutions of Illinois and Iowa, and Ordinance of 1787; *People* v. *City St. Louis*, 5 Gill, 368. If navigable, then the fact that it is so, does away, abrogates, abolishes the common law (for at common law it is not navigable), and hence the common-law rule of boundary (extending to the middle of the stream), does not hold; and the question comes up for settlement, does the riparian proprietor go to high-water mark? or low-water mark? or to the centre of the current? We say that owners of banks only go to low-water mark. 2 Porter, 448; 3 Black. 194; 4 Har. Dig. 2938; 4 Call, 441; 9 Wend. 571, and cases before cited. These decisions are sustained by acts of Congress. 1 U. S. Laws, 468, § 9; Ib. 491, § 6; Ib. 140, art. 4.

3. We maintain that, if it is not navigable, that then the island in question does not belong to the owner of the shore: 1. Because it is not expressly included in his grant, as will appear by reference to the patent and the plat of the survey, to which the patent in express terms refers. 2. Because in grants by the public, nothing passes by implication, or intendment, or by way of incident, as we have before shown, and as has been repeatedly held by the Supreme Court of the United States.

Suppose that riparian owners, in fact, have no title below high-water mark; does it follow that a trespasser may remove the shore between high and low-water mark, and injure the value of the property, and expose it to being washed away and destroyed? The sand in this case was taken from the upper end of the island, where most needed to protect the island. The defendant claims that he, and the public in common with him, have the right to remove from and around the island, everything below high-water mark. Is it not the inevitable tendency, if not the inevitable effect, of this asserted right, if exercised, to destroy the island, by ex-

VOL. III.                    2

posing it to action of the water? If you own a city lot in Muscatine, or Davenport, fronting on the river, has everybody, from A. to Y. inclusive, and "the rest of mankind," an undoubted legal right to remove sand, or gravel, or sink holes, *ad libitum, nolens volens,* up to high-water mark, &c., and thereby lessen its value, expose it to be washed away by the river, and to overflow? Such would appear to be the doctrine of the appellant in this case, extraordinary and unreasonable as it is! What is high-water mark? How difficult to determine in any individual instance, on fresh water streams.

The precise principle involved in this case, has been adjudicated in England. See Woolrych Law of Waters, § 12, from which we quote the following: "To trespass, the defendant pleaded that the close was the sea shore, and that all of the subjects of the king had a right to enter and carry away the sea-weed left by the tide, &c. This was holden to be a bad plea, there being no common law right of that nature." *Stowe* v. *Howell,* 1 Alc. & N. 348; Angell on Tide Waters, 260; *Phillips* v. *Rhoades,* 7 Metcalf, 322; *Emans* v. *Turnbull,* 2 Johns. 322. The analogy of the case cited from Woolrych above, and the one under review, is complete. Both are actions of trespass. One relates to sea-weed and the other to sand; both, says Kent, in 2 Johnson, 322, are marine acquests. In the one case, the defendant denies the plaintiff's title, and says the close was the sea shore, and in the other, the same denial is made. In the one case, the defendant pleads that "all of the king's subjects have a right to enter and carry away the sea-weed from the sea shore, left by the tide," &c. In this case, "the defendant claims to have no title to said island, but claims that all persons have the right to take sand from the place aforesaid, and he among the rest."

The case of *Blundell* v. *Catterall,* 5 Barn. & Ald. 208, was trespass for breaking and entering plaintiff's close, viz: the sea shore, between the high and low-water mark of the river Mersey, in Great Crosby, being an arm of the sea. The defendant pleaded: 1. As to the space between high and low-

water mark, a custom on the part of the·public to pass on foot and with carriages.   2. A right of bathing in the sea for all the public, and of passing and repassing the shore for that purpose.   3. A right of bathing and passing on foot only.   The court gave judgment for plaintiff.   BEST, Justice, dissenting.   HOLROYD, J., says, at "common law no person, except in case of necessity, has a right to come within or land, or ship goods, out of ports where the shore or land adjoining is private property," and that to do so is a trespass.   And in *Naylor* v. *Ingersoll*, 7 Barr, 201, it is said that "In England, and in this country, the space between high and low-water mark, on navigable streams, belongs to the owner of the adjacent soil," citing *Cooper* v. *Smith*, 9 Serg. & Rawle, 32; Baldwin, 72.   The case in 7 Barr, shows that the Pennsylvania doctrine does not rest on statute.   The leading case of *Blundell* v. *Catterall*, in 5 B. & Ald. 208, is important in this respect, viz: That it decided that the right of bathing was not one of the common law rights, which the public has in the sea, and it defines those rights, but among its enumeration, does not apyear the right to take sand, seaweed or gravel.

The case in 1 McCord (S. C.), 357, is important for us.   It lays down this rule: "The public may use the water for the purpose of navigation; but that does not impair the right of the individual to the soil, and the use of the water, as far as is consistent with the right of the public."   This is precisely the doctrine for which the appellee contends in this case. If the plaintiff cannot recover in this action, it must be because he has no control beyond high-water mark, and this, then, will be the case with every riparian proprietor.   How, then, do you get the power to erect wharves, &c., down to low-water mark?   In 13 Howard, 417, it is said: "We must reject the attempt to trace the line by either ordinary low water or low water.   These terms are only predicable of those parts of rivers within the ebb and flow of the tides, to distinguish water at spring or neap tides."   In 13 Howard, 417, this language is used: "Such a difference is uniform twice within every month of the year, and because it is so,

it is termed ordinary." "In that part of a river where there is no ebb and flow, the changes in the currents are irregular, and occasional, without fixed quantity or time of recurrence, except with the wet and dry seasons of the year. And again, in 13 Howard, 423: "The term high water, when applied to the sea, where the tide ebbs and flows, has a definite meaning. The line is marked by the periodical flow of the tide, excluding the advance of waters above this line in the one case, by winds and storms, and in the other (rivers), by freshets or flood." " But in respect to fresh water rivers, the term is altogether indefinite, and the line marked is uncertain. It has no fixed meaning in the sense of high-water mark, when applied to a river where the tide ebbs and flows, and should never be adopted as a boundary in the case of fresh water rivers, by intendment or construction, whether between states or individuals," and then Justice NELSON proceeds to lay down the true boundary line, in case of fresh water rivers. The case of *Wilson* v. *Forbes*, 2 Dev. Law Cases, 34, repudiates the common law test of navigability; and says the "margin of the water is the boundary of the grant at low-water mark." This was the case of a grant of land upon Trent river.

As to the exclusive right of the owner to the sea-weed of the shore, down to low-water mark, see Angell on Tide Waters, 260; *Chipman* v. *Kimball*, 9 Conn. 38; *Emans* v. *Turnbull*, 2 Johns. 313; *Moore* v. *Griffin*, 9 Shepley (Me.) 350; *Phillips* v. *Rhodes*, 7 Metcalf, 322; 7 Conn. 186, and cases cited; 15 Ib. 137. At common law, the public have no right of towing on navigable rivers. This was expressly so decided by Lord KENYON in *Ball* v. *Herbert*, 3 T. R. 253. Angell on Tide Waters, 177. At common law, the public have no right of lading and unlading, on the banks (*ripa*), of a navigable river. Angell on Tide Waters, 178. This was affirmed in the leading cases of *Blundell* v. *Catterall*, 5 B. & Ald. 91. "The *ripa* (banks) of a navigable river, are not *publicii juris*." See also same doctrine in *Ball* v. *Slack*, 2 Wharton, 530, 539. If the law thus protects private rights in this emphatic manner, how can it be contended that the pub-

lic have the right to take sand in front of a man's grant. Judge GRANT attempts to evade the force of the case in reference to sea-weed, in 2 John. 322, by saying that there was something peculiar in that case. This is not so. C. J. KENT expressly says that the plaintiff is entitled "to recover according to the rule of the common law," in such cases. Angell on Tide Waters, 260, recognizes the exclusive right of the owner of land to the sea-weed, at common law; and the note in reference to Lord HALE, read by the gentleman, is not the doctrine of the text. No case *contra* can be found, and Chancellor KENT says, that sea-weed is a marine increment. Is not sand the same?

The case of *Morgan* v. *Reading*, 3 Smedes & Marsh. 366, and the case of *Middleton* v. *Pritchard*, 3 Scam. 510, are the only cases, to our knowledge, in which the common law has been held to apply to the Mississippi river. The case in 3 Sm. & Marsh. was brought by the riparian owner, for use and occupation of his land on the Mississippi river, between high and low-water mark, by the defendant. The defence set up was that the plaintiff only owned to high-water mark. The court decided the defence not a good one, and the plaintiff recovered. The only point before the court was, whether the plaintiff could recover for the use of land by the defendant, between high and low-water mark, and the court decided this, the only question before it, correctly. But the court traveled outside of the case, and seemed to intimate that the common law obtained, and the plaintiff owned *ad filum aquæ*. All this is mere *obiter dicta*, not being before the court. Judge SHARKEY, in his opinion, says, that Pennsylvania is the only state which had not adopted the common law, when, in fact, the common law had been repudiated in the states all around him. It was expressly repudiated in Alabama, 2 Porter, 436; in Tennessee, 6 Tenn. 358; in North Carolina, 2 Dev. (Law) 30, affirmed in 3 Iredell, 285; South Carolina, 1 McCord, 580; besides other states, as cited in our brief before. At the conclusion of the opinion, Judge SHARKEY seems to waver in his opinion, but says the plaintiff is entitled to recover, because he certainly owns to low-

water mark. Under the circumstances, we submit that the dicta in this opinion, are not entitled to much weight.

### RECAPITULATION.

We briefly recapitulate our positions as follows:

1. That this is the first time in the judicial history of the country, in which the right of the United States to survey and sell islands in navigable rivers, after the survey and sale of the main land, has been disputed and denied. Yet such has been the almost constant practice of the government. The records of the land office will show, that the United States have always claimed and exercised this right, and that in its surveys, islands in such rivers have, as often as otherwise, been left unsurveyed at the time of the surveys on the shore. Will the mere omission or neglect of a deputy surveyor to survey an island, prejudice the government?.

2. That there never has been a decision made in the United States, limiting the riparian owner along our large rivers to high-water mark. The majority of cases hold that he goes to low-water mark, and some to the centre thread of the current; but none, that he only extends to high-water mark.

3. That for the reason given by Sir WILLIAM SCOTT, public grants are to be taken most strongly against the grantee, and "nothing is to be presumed not clearly and indisputably expressed." It is not to be presumed, then (especially in the face of the constant practice of the government to the contrary), that because Pelican island was not surveyed when the main land was, that the government intended that it should belong to the riparian owner, who never intended to buy it, who does not now claim it, and who never paid for it. The island does not belong to the owner of the main shore, because it is not included in his patent. He does not own it by implication, for in public grants, nothing passes by implication or intendment. In 2 Porter, 436, this point was expressly decided—that the United States did not grant below low-water mark.

4. The United States have a perfect right to sell the islands in navigable streams, but not so as to interfere with the easement of the public for purposes of navigation. Such has been the uniform practice of the United States; and they have as much right to sell Pelican island as they had to sell Credit island, or any other. At common law, islands in the sea, *prima facie*, belonged to the king, but "might become vested in the subject by prescription or grant. Hale's *De Jure Maris*, c. 4, 5. This was fully settled in *Sir Henry Constable's Case*, 5 Coke, 105, b; Woolrych on Waters, 49.

5. That the alluvion of banks and islands belong to the owner of the adjoining land. The government sets up no claim to such alluvial formations, and could not sustain it, if they did. 2 Public L. O. & Instruct. 758; Letter Com'r G. L. O. to Hon. J. B. Weller, 31st March, 1840.

6. That the common law as to the navigability of waters, does not apply to such rivers as the Mississippi. Then the common law does not determine the extent and effect of a grant of land upon this river. We cannot say that by the common law such owner goes to the centre, or by that law he is limited to high-water mark, because the common law, not being applicable, has nothing to do with the matter.

7. That if the Mississippi be decided navigable, and the common law effect of grants upon navigable waters applies to it, yet the ownership of the soil, or, at least, as against trespassers, who, like the defendant, disclaim all right, the control of the soil, down to low-water mark, is in the proprietor of the adjoining bank. Woolrych on Waters, 38, and the action of trespass to sea shore, which is decisive of this point. 2 Smith's Leading Cases, 193, and *Hart* v. *Hill*, 1 Wharton, 124, which expressly decides this point as "to sand and gravel;" also 2 McLean, 382, which is conclusive on this point of itself. Justice McLEAN expressly recognizes the right of riparian owners on the Ohio, below high-water mark.

8. That high-water mark should never be adopted as a boundary in the case of fresh water rivers, by intendment or construction, whether between states or individuals. 13

Howard, 423.   The defendant in this case, asks the court to put this construction upon grants by the United States.

9. That grants by the government, on such rivers as the Mississippi, carry the grantor to low-water mark, subject only to the public easement of navigation.   This rule at once preserves the value of river fronts, and the rights of riparian owners, and preserves all the rights of the public in the common highways of our great rivers.

10. That the defendant in this case, being a trespasser, and expressly disclaiming all right or title, ought not to be permitted to do acts, the direct and only effect of which are to injure and destroy the land and property of another, and that, too, irreparably, and with impunity.

11. That under the acts of Congress of 11th February, 1805, and others, navigable water courses are the natural and actual boundary lines of grants upon such water courses, and when so platted and returned, they are to be considered the true boundaries, &c., and that in navigable streams, the title to the bed (not the banks) remains in the United States.   See 1 Statutes at Large, 268, § 9, and other acts with same provisions.

Preliminary to noticing the two main propositions, which the counsel for the appellant endeavored to maintain, we desire to advert to the extraordinary position which he assumed in the outset of his argument.   We state it in his own language, thus: "The ebb and flow of the tide does not constitute the difference at common law between a navigable river and one not navigable."   This is a bold, and, to us, a novel position, and one which, with all due deference, we do not think he maintained.   In support of it, he cited Woolrych on Waters, 40, and Lord MANSFIELD in Cowper, 87.   But see Woolrych, 62, where he recognizes the distinction that the tide is the test of navigability.   The most singular circumstance about the matter is, that Mr. Woolrych does not appear to be conscious of innovating upon, or overthrowing, the common law, and he did not intend to lay down any such doctrine as the counsel supposes.   See also, Woolrych, citing Lord MANSFIELD, in the case of Rex v. Smith, 2 Doug.

441, where his lordship holds to the doctrine as generally laid down. There can be no question, that the settled rule of the common law as to navigability of streams, depends on the ebb and flow of the tides. Davies, 152; 4 Burrows, 2162; 12 Mad. 510. The most that the counsel succeeded in doing, was to establish that this, like all other general rules, was subject to some exceptions; and as we do not care much about the question in this case, we will leave the counsel to settle it with Mr. Angell in his work on Tide Waters, 75, 76; Judge HENDERSON (N. C.), in 2 Dev. 34; C. J. TANEY, in 12 Howard, 457; Chancellor KENT, in 3 Cow. (7 ed.) 519; C. J. TILGHMAN, in 2 Binney, 476; and Chancellor WALWORTH, in 17 Wend. 571.

Judge GRANT'S first position was, that the Mississippi river is a navigable stream, and as a corollary, that the plaintiff in this suit only owns to high-water mark. How did the gentleman establish that the Mississippi river is a navigable stream? By citing certain authorities to show that the common law is not applicable to it, and all of which we think contain good law. If the common law applies to the Mississippi, not being a tidal river, it is not navigable. If, as he contended, this river is navigable, then it is so in spite of the common law; or, more correctly speaking, it is navigable, because the common law, not having any applicability to this river, has nothing to do—I repeat it, the common law has nothing to do—with the question as to whether it is navigable or not navigable. Our brother Grant's authorities show this most conclusively, and we are much obliged to him for his kindness in introducing them. He will permit us to thank him for having made out for us, on this point, a stronger argument than we could have made for ourselves. Now let us point out the fallacy of his proposition and reasoning. It is conceded that the common law has nothing to do with the matter. Why does he say that the plaintiff in this case only owns to high-water mark? Because, he says, the owners along-navigable waters only go to high-water mark. Where is the proof of this? Where is his authority for this? Why, he refers, to establish this,

the proof of his corrollary, to the same common law which he and his authorities repudiate, and say is not applicable to the Mississippi river. If the common law is not applicable to the river, then none of the effects or consequences of the common law apply to it; one of these effects and consequences being, it is contended, to limit the riparian owner to high-water mark. The fallacy, then, of his argument, is simply this, and it is so obvious, that "he who runs may read" it. In establishing his main proposition, that the river is navigable, he ignores the common law—says it is not applicable to this river—that it has nothing to do with the matter, &c; and yet, when he comes to consider the corollary of his proposition, the same common law, which but a moment before he ignored and declared not applicable, is summoned into requisition to support the corollary, viz: that the riparian owner is limited to high-water mark. It is inconsistent to say that the common law has nothing to do with the Mississippi, and at the same time say that the riparian owner along that river, only goes to high-water mark, because the common law says he owns no further.

WOODWARD, J.(1)—This is the first case which has arisen in the territory, or state, of Iowa, raising the question of riparian rights on the Mississippi river; and the question whether that river is a navigable stream, in the broad sense, or only in a limited one; and whether its shores or bed, or both, belong to individuals, or to the public? The cause might be disposed of briefly, but it calls for a somewhat free and full examination, on account of its interest and importance; on account of the fullness with which it has been presented by counsel, arraying the authorities from all the states upon all sides of the questions involved; and on account of the state of the authorities; in which much has been erroneously taken for granted—a bearing given to pre-

---

(1) STOCKTON, J., not having heard the argument, took no part in the decision of this cause.

viously decided cases, which they would not warrant—and unsupported inferences drawn from fair decisions.

We are of the opinion that the plaintiff cannot maintain his action. And in expressing our views, we will consider the following three propositions: First. Although the ebb and flow of the tide was, at common law, the most usual test of navigability, yet it was not necessarily the only one. Second. However the truth may be upon the above proposition, that test is not applicable to the Mississippi river. Third. The common law consequences of navigability, attach to the legal navigability of the Mississippi.

First. Although the ebb and flow of the tide was, at common law, the most usual test of navigability, yet it was not necessarily the only one. The term navigable embraces within itself, not merely the idea that the waters could be navigated in fact, but also the idea of publicity, so that saying waters were public, was equivalent, in legal sense, to saying they were navigable. Yet the navigability in fact, was the leading idea, and was the ground of their publicity. But on the other hand, there are in England and in this country, many arms of the sea, which, though not navigable in fact, are so legally. It is worthy of attention, that the ebb and flow of the tide does not, in reality, make the waters navigable, nor has it, in the essence of the thing, anything to do with it. The fact that certain rivers were accessible, and could be navigated by vessels of considerable burden, always constituted the substance of the thing. But, as in England, the tide waters, particularly the seas, were by far the most important; and as all of the rivers of that country, navigable in fact, were affected to a greater or less extent, by the tide; and as the high and important admiralty jurisdiction was always governed by this criterion, the ebb and flow of the tide became the usual test. The nature of the admiralty, relating as it did, to the high seas, where the king's authority had sole sway, and to the arms of the sea, gave prominence to the tidal ebb and flow, in legal thought. But there is nothing in nature, or reason, to constitute this

the only criterion. *Blanchard* v. *Porter*, 11 O. 143; 12 How. 454.

In the treatise on the law of waters, by Woolrych, 40 (margin), he divides rivers into public and private. He says: "A public navigable river frequently owes its title to be considered as such, from time immemorial; by reason of its having been an ancient stream; but very many acts of Parliament have been passed, to constitute those navigable rivers, which were not so before. Waters flowing inland, where the public have been used to exercise a free right of passage, from time whereof the memory of man is not to the contrary, or by virtue of legislative enactments, are public navigable rivers. This is the most unfailing test to apply, in order to ascertain a common right; others have been attempted, and frequently without success." Thus he negatives the idea that none are navigable but where the tide flows. And then he proceeds to show, that all waters are not navigable (in the legal sense) where the tide does flow; and he cites the case of *The Mayor of Lynn* v. *Turner*, Cowp. 86, in which it was contended, that a river which flows and reflows, and is an arm of the sea, is, *prima facie*, common to all; and therefore "it was urged that an action on the case could not be sustained against the corporation of Lynn, for the non-repair of a certain creek, because the tide of the sea had been accustomed to flow and reflow therein; consequently, it was said, this non-feasance was punishable by indictment only, because the water must be deemed public. But this argument was treated by the court as a fallacy; for they denied that the flowing or reflowing of the tide constituted a navigable stream; there being many places where the tide flows, which are not navigable; and the place in question might be a creek in the private estate of the corporation." The language of Lord MANSFIELD, in that case, is emphatic: "How does it appear that this is a navigable river? The flowing and reflowing of the tide does not make it so."

In *Miles* v. *Rose*, 5 Taunt. 706, GIBBS, C. J., says that the flowing of the tide, though not absolutely inconsistent with

a right of private property in a creek, is strong *prima facie* evidence of its being a public navigable river; and HEATH, J., expresses the same opinion.   And in *Rex* v. *Montague*, 4 B. & C., 598, in 1825, BAYLEY, J., says: "The strength of this *prima facie* evidence must depend upon the situation and nature of the channel.   If it is a broad and deep channel, calculated for the purposes of commerce, it would be natural to conclude that it has been a public navigation; but if it is a petty stream, navigable only at certain periods of the tide, and then only for a very short time, and by very small boats, it is difficult to suppose that it ever has been a public navigable channel."   And HOLROYD and LITTLEDALE, Justices, concur: 10 E. C. L. 414.   And Woolrych, again, makes the following conclusion: "The circumstance, therefore, of the flow and reflow of the tide, is one of the strongest in support of a public right; but so far from being conclusive, we have mentioned a case in which such a test has been found to be fallible.   Public user, for the purposes of commerce, is, consequently, the most convincing evidence of the existence of a navigable river," &c.   It seems clear, then, that even taking the doctrine of the English books, whilst the flow of the tide became, and was spoken of as the usual test, yet it was not this which constituted a stream navigable, nor was it the only test; and that sometimes even this failed.   See Hale's *De Jure Maris*, in 6 Cow. 539.

The soil under navigable streams belonged to the king, as *parens patriæ*, for the same reason that the waters did; that is, as a trust for the public use and benefit, although he might grant private rights in either the soil or the waters. This right, however, has not existed since Magna Charta. Woolrych, chap. 1 and 2: Angell on Tide Waters, 19, 67; Hale, *De Jure Maris*, in 6 Cowen, 539; *Chapman* v. *Kimball*, 9 Conn. 38, citing Harg. Law Tracts, 12, 13, 17, 32; Constable's Cases, 5 Rep. 107; *Ball* v. *Herbert*, 3 T. R. 253; Com. Dig. tit. Navigation A. B.; *The King* v. *Smith*, Doug. 441. These authorities are cited by the court in 9 Conn. to support the proposition, that riparian proprietors, bounded on a navigable river, own the soil respectively to high-water

mark, and no further.   The plaintiff does not controvert this proposition.   He does not claim that the common law rule applies to this river.   On the contrary, he claims it does not. And it is necessary for him to thus hold, for if that rule is applied, it carries the riparian proprietor, Cook, *usque filum aquæ;* and this would take the plaintiff's whole island from him.   The question of the applicability of that rule, however, lies in our path, and must be determined.   It is the main question in the case.   But we cannot take the law upon the plaintiff's admission, and therefore must examine it.

Second.  However the truth may be upon the first proposition, the flow and reflow of the tide is not applicable to the Mississippi, as a test of its navigability.   And third: The common law consequences of navigability, attach to the legal navigability of the Mississippi river.   The arguments and authorities upon these two propositions, being in a great measure identical, they must be considered together.

The thought has been before suggested, that as a real and virtual test, the tide is a merely arbitrary one, and is not supported by reason; since many waters where the tide flows are not in fact navigable, and many where it does not flow, are so.   It is navigability in fact, which forms the foundation for navigability in law; and from the fact follows the appropriation to public use, and hence its publicity and legal navigability.   It is true, that this legality attaches to some waters which do not possess the requisite quality in fact, but this arises from their relation to the high seas, and to admiralty, and from the difficulty of making an hundred exceptions.   It is impossible to bring the mind to an approval, when we attempt to apply to the rivers of this country, stretching up to three thousand miles of extent—flowing through or between numerous independent states—and bearing a commerce which competes with that of the oceans —a test which might be applicable to an island not so large as some two of our states; and to streams whose utmost length was less than three hundred miles, and whose outlet and fountain, at the same time, could be within the same state jurisdiction.   In England, or in Great Britain, the

chief rivers are the Severn, Thames, Kent, Humber, and Mersey; the latter of which is about fifty, and the first about three hundred miles in length, and of this (the Severn) about one hundred miles consists of the Bristol channel. The world renowned Thames, has the diminutive proportions of two hundred miles. And of even these lengths, not the whole is navigable. Thus, it will be seen, that these chief rivers of good old England, range in extent with our Connecticut, Merrimac, Hudson, Allegany, Monongahela, Cedar, Iowa, and Des-Moines, and bear a proportion of one to twenty, when compared with the greater rivers of this continent.

One of the counsel says he called in vain, in another cause, to learn whether the common law prevails here, and how it came. We will not discuss this question; but it is presumed that some system of law has place here, outside of the statutes, for they assume it. There are but two civilized systems, the civil and the common law. If the civil rules, then are these streams navigable and public, without further discussion. And if we, like the people of these states, generally, have brought the common law with us; then, too, we, like them, have brought such parts of it as are adapted to our institutions and circumstances; and we ask with confidence, whether the rules and tests which are applicable enough to the rivulets of England, shall be taken to measure those waters, whose flow is through the climates and zones of the earth?

The real test of navigability here, is ascertained by use, or by public act or declaration. We will inquire what these have been in the case of the Mississippi river. By the Spanish treaty of 1795, this river was to remain free to the subjects and citizens of the two powers, and not to others, without special convention. 8 U. S. St. at Large, 140. The act to enable the people of the territory of Orleans, to form a constitution and state government, 20th February, 1811, § 3, provides, that the river Mississippi, and navigable rivers and waters leading into the same, or into the gulf of Mexico, shall be common highways, and forever free, &c. 2 Ib. 642.

The same is again declared in the act admitting the state of Louisiana into the Union, April 8, 1812 (2 Ib. 703); in the act constituting the state of Mississippi, March 1, 1807 (2 Ib. 349); in the act establishing the Missouri territory (2 Ib. 747); and in the act authorizing a convention to constitute the state of Missouri, March 6, 1820 (2 Ib. 546). We then come to the ordinance for the government of the northwest territory (Code of Iowa, 494), and to the acts relating to the survey and sale of the lands (act of May 18, 1796, 1 U. S. St. at Large, 466, 468)—the latter of which declares, that the navigable rivers of the territory shall be and remain public highways; and we arrive at the ordinances establishing the territories, and admitting the states of Illinois, Iowa, Wisconsin, and Minnesota. These are the declarations of the government of the United States. And these several laws, ordinances, and constitutions do, not only with the authority of law, but also with the force of compacts between the United States and the several states, declare and constitute the Mississippi river a public highway, in the highest and broadest intendment possible.

The acts of the United States consist in the laws and practice relating to the survey and sale of the public lands. See the above act of May 18, 1796, &c.; also the laws establishing the general land office, and the regulations of that office. By these, it is well known; that the whole bed of navigable rivers is excepted from the surveys; the rivers are meandered, the lines are run, and monuments set upon the margin of the bank. The amount thus made, is computed, and the land sold as of such quantity, and with reference to the plats and field notes of the surveys thus made. By the uniform practice, the islands in the rivers do not pass by grants upon the mainland, but are oftentimes surveyed and sold separately, and subsequently. This was the case with regard to the islands now in question before us.

The plaintiff does not contest the idea that this river is navigable in some sense, but holds that it is not so in the common law sense, or that it is not accompanied by the common law consequences. He claims that the riparian pro-

prietor owns to low water, and that the bed of the river below that, is in the public. The defendant, on the other hand, holds that the proprietor owns to high-water mark only; or, in other words, to the margin of the bank, which is the same thing, in such cases. We shall hereafter have occasion to ask, by what authority or reason, we can, upon rule, throw away both the old lines—the high-water and the *medium filum*—and take the low-water. Some criticism has passed upon the application of the terms "high-water mark and low-water mark," to rivers above the tide. Its perfect correctness is not claimed; but it is sufficiently true, and is more expressive, than any known substitute.

In approaching the cases, it is to be observed, that those states which have no navigable waters other than those where the tide flows, or whose rivers are but small, and their effectual navigability is limited, or nearly so, to the tidal waters, have held more nearly to the usual common law test, and have applied the consequences as inferred at common law; whilst those states which have less relation to the salt waters, or whose rivers are larger, and depend less upon the tide waters for their navigability in fact, have been inclined to depart from the old rule. And those cases which hold tide water to be the criterion, also treat the soil of rivers above the ebb and flow of the tide, as private, notwithstanding it is considered subject to the public right of navigation, when the stream is navigable in fact.

The courts in the states of Maine, New Hampshire, Connecticut, New York, Maryland, Ohio, Illinois and Mississippi, have adopted the common law rule, with more or less directness and fullness. The cases are very fully collected by the counsel, and we have seen and examined nearly all of them. In the most of those from the northeastern states, the subject is discussed very little; but they simply assume the common law rule as the one to decide by, and look no farther. It is conceived that there is no case in the New England states, which requires comment. In New York, the subject has received a good deal of attention in the cases of *Varick* v. *Smith*, 5 Paige, 137; *Same* v. *Same*, 9 Ib. 547;

*Ex parte Jennings*, 6 Cowen, 537, in a note to which is pub-lished a part of L. Hale's Treat. *De Jure Maris; Canal Com.* v. *The People*, 5 Wend. 447; *People* v. *Canal Com.*, 13 Ib. 358; *Canal Appr's* v. *The People*, 17 Ib. 571; *Hewlett* v. *Pearsall*, 20 Ib. 111; *Pearsall* v. *Post*, 22 Ib. 425; *Canal Com.* v. *Kempshall*, 26 Ib. 404; *Gould* v. *Hudson R. R. R. Co.*, 2 Seld. 522.

The cases in Pennsylvania, have been cited in the books, on both sides of this question; but it is conceived that there has been a misapprehension of them, in citing them in favor of the old rule. Thus, the American editors of Smith's Leading Cases, in their note to 2d vol. 193, say, that "so far as the tide ebbs and flows, the ownership of the soil to low-water mark, is in the proprietor of the adjoining bank," and cite several Pennsylvania cases, among which are *Hart* v. *Hill*, 1 Whart. 124; and *Ball* v. *Slack*, 2 Ib. 508. In that state, the courts have recognized the right of several fisheries, as arising from ancient custom and from statute; but they have held no doctrine of a right to low water, any farther than as relating to and connected with, such fishing. Thus *Hart* v. *Hill* was for a direct interruption of the right of a several fishery, and the court say, "and first, a fishery is in the river, and is not the space between high and low water, though the use of that space may be necessary in the use of it, and may be included in the term fishery." It is true that they use general language, which implies more than this, but it is to be taken in reference to the case be-fore them.

In *Ball* v. *Slack*, 2 Whart. 508, the reporter's abstract says: "It seems that the owners on the Delaware and Schuyl-kill, have a right to the land between high and low water, subject," &c. It may be doubted whether even this, is war-ranted by the opinion, but admitting that it is, the law there is distinctly settled to the contrary, in *Carson* v. *Blazer*, 2 Binn. 475, and in *Shunk* v. *Schuyl. Nav. Co.*, 14 S. & R. 71. Many inaccurate expressions have been used in the cases in that state, relating to fisheries, which have led to confu-sion, but the subject is much cleared in the two cases above

McManus v. Carmichael.

cited.   And both Pennsylvania and Connecticut recognize a right, either from statutes or local common law, to build wharves, &c., for commercial purposes.   The case of *Chapman* v. *Kimball*, 9 Conn. 38, announces the rule to be, that owners on navigable rivers own to high-water mark.   They say : " The usage of the owners of land to high-water mark, to wharf out against their own land, has never been disputed. This is our common law."   Time will not permit the examination of the remainder of the cases cited in the above note, but it is conceived, with deference, that they do not show such a rule to be established—at least outside of their own state.

The case of *Mullanphy* v. *Daggett*, 4 Mo. 343, is not to be cited in this class, for it stands upon the express ground, that the Spanish government granted to the water.   And *Browne* v. *Kennedy*, 5 Har. & John. 195, is hardly to be ranked here, for the basis of it is the king's grant to the lord-proprietor; which the court considered as carrying the right to the shore, and which the proprietor afterward granted away.   In the above cases, from the most of the foregoing states, the consideration arising from the common law rule, and those connected with it, to which we have before alluded, seem to have carried the minds of the courts, as of course, for there was nothing in their circumstances to awaken the question of the applicability of the old rule. And, besides, the earlier of them set the rule down, before the development of the western country had shown the vast public importance of our greater rivers, as amounting to inland seas.   It is also worthy of attention, that these same cases hold, that the rule does not extend to larger bodies of fresh and standing waters, namely, the lakes which are within the limits of New Hampshire.   They carry the adjacent owner's right to the water, but not *ad medium*.   See *The State* v. *Gilmanton*, 9 N. H. 463; *Canal Comrs.* v. *The People*, 5 Wend. 447 ; and Hale's Treat. in 6 Cow. 545, is cited.

But when we approach those states which, while they border upon the great western rivers, have still been held

more or less by the common law rule, we are compelled to give very considerate attention. This has been the case with Ohio. The case of *Blanchard* v. *Collins et al.*, 11 Ohio, 138 (old series), in 1841, if regarded as one of the first settling this question, is certainly not a fully considered one. The common law rule is at once recognized. There is not a word in relation to the character of that river, the Ohio— nothing in relation to the ordinance of 1787, and its meaning and effect—and nothing concerning the laws and practice in respect to the survey and sale of the public lands. It stands chiefly on the two cases in New York. *The People* v. *Platt*, 17 Johns. 195, and *Hooker* v. *Cummings*, 20 Ib. 90; and its own case, *Gavitt* v. *Chambers*, 1-4, Ohio, 643. It also relies, partly, upon the cases of *Cooper* v. *Smith*, 9 S. & R. 26, and *Shunk* v. *Schuylkill Nav. Co.*, 14 Ib. 74, which it claims to teach, that the riparian proprietor owns to the water, but not *ad medium filum;* and thus neither following the common law, nor wholly abrogating it. We conceive that the court gave these two cases a meaning which they do not inculcate. They will be examined hereafter.

All the cases in Ohio may be influenced by the consideration, that by the cession of Virginia to the United States, by the compact of 1792, between that state and Kentucky, the latter owns the river to the water's edge on the Ohio side, and Ohio owns the soil down to the water, but no part of the water, although she has a concurrent civil jurisdiction with Kentucky. *Handley's Lessee* v. *Anthony*, 5 Wheat. 374. In this case—*Blanchard* v. *Porter*—the court considers the Ohio a navigable river, but not in the technical sense; and say, that "grants of land bounded on rivers, or upon the margins of the same, above tide water, carry the exclusive right of the grantee to low-water mark; or as some of the authorities say, to the centre of the stream. None of our rivers in the western country, are navigable in the technical acceptation of the term. They fall within the second class. The distinction was originally made, in order to define the jurisdiction of the admiralty courts." Here we find

it recognized, that the admiralty had much to do with the creation of the old rule; and what is the inference, when we learn that *our* admiralty jurisdiction extends over these very rivers. *Propeller Genesee Chief* v. *Fitzhugh*, 12 How: 443, 454.

The case of *Walker & Fulton* v. *Board of Public.Works*, 16 Ohio, 540 (old series), in 1847, is one of mandamus, under a statute, to inquire into the right to damages of proprietors on rivers, in which the state had authorized improvements. It related to the Great Miami, which had been declared navigable by statute. The court held justly, that such statutory declaration, could not take away the prior rights of riparian owners. They touch very briefly these rights " in the streams within our borders, which are in fact navigable," and say, that the question is not new in that state, having been repeatedly before that court, and that the rule is, that the riparian proprietor owns to the centre, or the " entire river," if he owns land on both banks. This manifestly is restricted to the streams strictly within their borders. Otherwise, it contradicts the other decisions. And this leaves out the Ohio and the Wabash. *Stinson* v. *Butler*, 4 Black. 285, considers the English rule as to high-water mark, as applicable to waters which ebb and flow, and curtly holds, that grants by the United States of lands on the Indiana side of the Ohio, extend to low water, and seems to infer it from the fact that the state boundary goes there; and this is the only reason intimated. If the state boundary had gone to the centre, would the grant have reached it? If this is the argument, it conflicts with almost all on the same side of the general question.

The case of *Middleton* v. *Pritchard*, 3 Scam. 510, goes further,. and is one of the strongest of the western cases. It was trespass for cutting trees. The plaintiff bought of the United States the fractional southeast quarter of S. 13, T. 5, N. R. 10, W., of 3 P. M., in Illinois, containing 32.74 acres. In front of it, in the river, within his lines if extended, is an island, probably containing nearly the same quantity, separated from the main land by a slough or bayou, which was

covered by water only a smaller part of the year, and the remainder of the time is uncovered, and grass grows there. There is a distinct bank and shore on the margin of this fractional section, and the survey was along the bank, the island not having been surveyed. The court held, that the plaintiff, by his purchase, took the island, but it is not clear whether they considered him as going to low water only, or to the middle of the river. The dissenting opinion of WILSON, C. J., rather indicates the latter, and there is no reasoning which negatives it, whilst the reasoning upon the common law rule, if carried out, would take the plaintiff to the centre. There are two points, upon which the court departs from the mass of cases; first, it applies to the grant of the government, the rule of private grantors, namely, that the grant is to be taken most strongly against the grantor; and then assuming that it is a grant, bounded by the river, they apply the other rule, that it extends to the centre, unless expressly negatived. Second: it rejects the surveys, field notes, &c., as constituting any part of the description or limitation, and say these are only for computation, and to arrive at the price. Now, we conceive, that the rule of a grant being construed most strongly against the grantor, does not apply to public grants; but that the government, being but a trustee for the public, its grants are to be construed strictly. *Varick* v. *Smith*, 9 Paige, 547; *Canal Comm'rs* v. *People*, 5 Wend. 444, 460, 464; *Same* v. *Same*, 17 Wend. 574, note, 612; *La Plaisance Bay* v. *Monroe*, Watkins' Ch. 155; *Charles R. Bridge* v. *Warren*, 11 Pet. 544; *Stonebridge Canal* v. *Wheeley*, 2 Barn. & Add. 792. And we had supposed that the grants of land by the United States, in their patents, had relation to the surveys, plats, and field notes. *Jackson* v. *Freer*, 17 Johns. 28; *La Plaisance Bay* v. *Monroe*, Walk. Ch. 155; *Chinoweth* v. *Les. of Haskell*, 3 Pet. 96; *McIver* v. *Walker*, 4 Wheat. 447; *Pearsall* v. *Post*, 20 Wend. 116; *Rowan's Ex'rs* v. *Portland*, 8 B. Mon. 232; 17 M. 207; 9 Watts, 117; 2 Cart. 278; 7 Johns. 222.

But the chie   ustice, WILSON, differed from the conclu-

sion of the majority of the court in the above case. He dissented from the application of the above rule to public grants; and we think his opinion more harmonious in its course of thought, with the train of legal reasoning generally. It would be gratifying to quote a larger portion of his remarks, but a few brief passages must suffice. He objects a want of authority in the agents of the government to sell, thus: "The land authorized to be sold," he says, "and the mode of selling it, are prescribed by law, and all sales in violation of that are void." "These surveys and plats are the guides of the land officers in making their sales; they have no authority to sell a single acre that has not been surveyed. Every tract of land liable to sale, is specifically described," &c. "It follows, therefore, as a necessary consequence, that islands, as well as other lands, that have not been surveyed and platted as the law requires, cannot be sold. It has no description known to the law." And he argues that neither the government nor purchasers, understand or intend that islands pass by a sale of lands on the nearest shore.

*Morgan & Harrisson* v. *Reading*, 3 Sm. & M. 366–395, in 1844. This case was very completely argued, and we cannot say but that it was deliberately considered. It takes the English rule as the test, and applies it in the legitimate, logical consequences, and gives the riparian proprietor *ad medium filum aquæ* of the Mississippi river.

If we were called upon to illustrate the impropriety of applying the English rule to this and other great rivers, we would cite the above case from Mississippi, and that of *Mullanphy* v. *Daggett*, 4 Mo. 343.

It is impossible to define beforehand, all the fair uses to which the navigators of these public rivers may have occasion to appropriate their shores. But let us take these two cases as examples. The above case from Mississippi shows, that the plaintiff was the owner of a certain lot in the city of Vicksburg, which lot the court held to extend to the middle of the river. The defendants were "citizens of Ohio, and regular flat boat traders." They landed their boat op-

posite the city, at the shore, and opposite the plaintiff's lot, and used the shore to tie the boat to, and land their goods upon. They remained there some time, and plaintiff charged them a rent of one dollar a day, which they refused to pay. The court held them liable. Now, is not this repulsive to all our ideas of the objects, uses, and appropriations of this great river? If it is said that they remained a long time (four months), let it be remembered that this is not the point of the case, and that it does not change the argument. If there is any weight in that fact, the answer is, that the landing should be placed under the authority of the city, and let that regulate such matters, and then the matter would fall under a different train of reasoning. The case of *Mullanphy* v. *Daggett*, 4 Mo. 343, was decided upon the Spanish laws and the king's special grant. But let us look at it in the light of that of *Morgan et al* v. *Reading*. The defendants hauled up their steamboat, for repairs, on the shore of the river. They remained there some six weeks, and erected a temporary blacksmith's shop, for the purposes of their work. What can be conceived of, as a more legitimate use of the shore of a great navigable river? It is said that they might go to some town or city, which has docks or ways, or other facilities for such purposes. Suppose the accident to occur far from such a place, and the operation to be impracticable, and then how many such places are there on our waters? The very question is, are they *compelled* to do so? Such arguments assume the practicableness of such a course; they take for granted the practical convenience—a matter which is generally desirable in such cases, for convenience and interest commonly lead to that course, when practicable. Are these rivers public and free to run your boat or vessel, and not public and free to stop when you are disabled? A restricted construction of the rights of navigation in these waters, reducing them to a petty sufferance, is greatly to be deprecated.

Before coming to the case where the common law rule is set aside directly, it seems desirable to look a little more closely at two or three of those in which the old rule is

McManus v. Carmichael.

adhered to, for in them we can readily perceive, that the adoption of the former rule was for a time doubtful; that it is to a limited extent only, that it is followed; and that the same courts would have probably decided differently, had they been adjudicating upon our rivers.

It is important to remember, that in very few of the cases in the northeastern states, has the question been opened up at all considerably; but in nearly all of the older ones, the wheels run into the old ruts, as a matter of course, rather than from a deliberate choice of ways, in the same manner that they generally do, unless something arises to start the attention anew. They first drew a line of distinction between streams and standing water, and refused the application to lakes or other large bodies of like waters, thus making a criterion about as important, in view of the real nature of the case, as the ebb and flow of the tide, or the saltness of the water. Thus, in New Hampshire and New York, the rule was withheld from the small lakes in their interiors, as well as from the larger ones on their borders. But, however it may have begun, the rule having been settled, and rights of property having grown up under it, and there being in this case, no strong reason for a change, it still and very properly remains. In *The Canal Commissioners* v. *The People*, 5 Wend. 423, Chancellor WALWORTH says: "The principle itself does not appear to be sufficiently broad to embrace our large fresh water lakes or inland seas, which are wholly unprovided for by the common law of England." "It is not necessary to express an opinion," he says, "whether this principle can be properly applied to some part of those streams which are navigable from the sea, by large ships and vessels, far above the influence of the tides, as that question can never arise in this state. We have no such rivers." Surely, such an expression leaves us, who have such rivers, free to discuss the question anew, and without feeling constrained by those decisions. Again, he says: "The rivers in England above tide, in point of fact, are not navigable, except for small craft; reasons, therefore, exist in that island, for the common law rule, which have

no existence in this country. It is contrary to fact, to assert that our immense fresh water rivers are not navigable; and it is matter of just exultation, as well as benefit, to the country, that in the United States we have rivers which above tide, are navigable to a greater extent than would be the circumnavigation of the United Kingdom of Great Britain and Ireland. It is therefore preposterous to contend, that the limited doctrines of the common law are applicable to the Mississippi, Ohio, Susquehanna, Niagara, and St. Lawrence. If applicable, the owners of land on these streams have a right to go to the centre of the rivers, and Grand Island, in the Niagara, with 18,000 acres, would belong to the owners of the shore."

The same case was again before the Court of Errors, under the name of *The Canal Appraisers* v. *The People*, 17 Wend. 571. In an abstract of the conclusions to which the senators delivering opinions arrived, Chancellor WALWORTH'S sixth proposition, is, that it is conceded that the common law rule does not apply to large navigable lakes, nor to rivers constituting the boundaries between that and other states. The third proposition of Senator BEARDSLEY, is that the common law rule, which authorizes the owners of the shores of rivers in which the tide does not ebb and flow, to hold *ad filum aquæ*, is not applicable to the condition of that state (New York), in respect to its large navigable rivers, in which no tide ebbs or flows; that from the acts of the government of New York, as well before as since the Revolution, in asserting the title of the public to islands and the beds of rivers, after granting the lands upon the shores of navigable rivers in which the tide does not ebb or flow, a strong presumption is raised that the common law, in this respect, has never been adopted there. The first proposition of Senator TRACY (president of the Senate), is, that the great fresh water streams of this country are not subject to the principle of individual appropriation, allowed by the common law of England; and his third is, that the reason of the rule, assigning the proprietorship of the bed of a river to the owners of the adjacent shores, wholly fails in refer-

ence to the large navigable rivers of this country. And fourth, that the long continued practice of granting islands in rivers, subsequent to patents covering the adjacent shores, contradicts the assumed application of the common law rule of riparian ownership, as applied to the great rivers of that state. The chancellor, who is in favor of applying the common law rule as far as practicable, says, in his opinion: " Considered in this light, is there any possible objection to the common law rule, even in regard to our largest rivers, which are wholly within this state, and above tide water? A different rule must probably prevail as to our large navigable lakes, which are mere inland seas, although there is neither ebb nor reflux of the tide; and also as to those lakes and streams which form the natural boundaries between us and a foreign nation." In this case, the surveyor-general of the state gave testimony, and in reference to it, and in allusion to the description in the grant, the chancellor makes a *remark* pertinent to the present surveys and sales. He says, the patent itself contains only the number of the lot, but that the survey and field notes in his office, contain a particular description of the boundaries; that where such lots are situated on the banks of navigable rivers, they are bounded on the banks of such rivers or streams, and run thence along the bank of such stream. This is a clear indication of the intention of the grantors, that the patent should not include any part of the *alveus* (or bed) of the stream, or of the islands therein. It is therefore a limited grant, and it cannot be extended to the thread of the stream, nor include any island therein, even on common law principles, especially when we take into consideration, that by a law of the state, the patentee was entitled to only a certain number of acres." Senator BEARDSLEY also, in his opinion, comments on the practice of the state in granting the islands separately from the main land, although the grants were in the terms bounded on the bank, and thence down along said river," which at common law would have extended the grants to the thread of the stream; and considers this as an evidence that the common law rule of fresh water rivers, had not been

McManus v. Carmichael.

regarded as applying to the Mohawk, the river under consideration. On page 616, he says: "Here allow me to inquire, what good reason can be urged in favor of applying these principles to our large American rivers, and thus keeping up a distinction in name, where in reason and good sense, none should exist. Why, for instance, should proprietors of land on the Mississippi, where the tide ebbs and flows, be restricted to the bank of the river, and that part only be called navigable; and those proprietors of lands immediately above the flow of the tide, be suffered to go to the centre of the stream, when the river in point of fact, is actually navigable for thousands of miles above tide water. Yet such are the absurdities of the common law, when applied to our large rivers. In England, this rule is very proper in reference to small rivers, and is calculated to prevent litigation, &c. But in respect to our large rivers, there does not appear to be any propriety in the rule; and if in England and in this country, it is essential to the public interest, to declare that arms of the sea, bays and rivers where the tide flows, belong to the state or nation, it is equally important that the same rule should prevail in respect to our large rivers, where the tide does not flow." In the same case, *Canal Appraisers* v. *People*, 19 Wend. 621, President TRACY says: "It is impossible for me to believe it reasonable or right, that the great fresh water streams of this country ever were or should be subject to those narrow principles of individual appropriation, which might fitly enough apply to the comparatively insignificant water courses which are found in England; and even in that part of the European continent where the civil law originated." "It is utterly incredible that when they (the colonists) surveyed the magnificent rivers, which a bountiful providence has provided, they could imagine that gifts, which from their very nature and extent were capable, not only of being enjoyed by all, but of supplying the wants of all, should by a misapplication of a principle utterly unsuited to the subject to which it was applied, be made the exclusive property of a few; in short, that because the common law had assigned the ownership of

a petty streamlet in England to its riparian proprietors, therefore, unlooked for by themselves, the first settlers on the banks of the magnificent rivers of this country, had acquired an exclusive right to the broad channels through which those rivers flowed." He then adverts to the practice of the state in granting islands separately from, and subsequently to, the grant of the main land, as negativing the idea that the bed is private, and concludes thus: "Ought we, then, in the face of this long continued practice, and unconstrained by any direct authority, either legislative or judicial, to close our eyes to the condition of things which surround us—the expanse of this continent—the copiousness of its waters—the improvements, intelligence and wants of this age? On such a subject as this, even admitting the facts to be obscure or equivocal, and the law to be unsettled, is it wise for us to disregard the dictates of enlightened reason, the suggestions of public policy, and the irresistible progression of liberal principles, resulting from the physical and intellectual advancement of mankind; and turning backward, to resort to the circumscribed views of a less enlightened age, for a narrow, insular, and inadequate rule, by which to measure the flow of our jurisprudence?"

Had these jurists been hearing the cause at bar, they could not have expressed sentiments more pertinent. Their thoughts we adopt, and make them our own, and we quote them freely, rather than merely express the views as of ourselves, that it may be seen that other judges, in other parts, and of more learning and ability, have entertained them, and therefore they are not novelties; and also that it may appear that the old common law rule has but a weak hold on the country, and is by no means dominant, but that all things combine for the rejection of its confining influence.

In accordance with this general and strong tendency, several states have refused to apply the narrow rule to their large waters. As early as 1810, the Supreme Court of Pennsylvania, in the case of *Carson* v. *Blazer*, 2 Binn. 475; took the lead. The case came up upon exceptions taken to a charge to a jury by Chief Justice TILGHMAN, concerning

a right of fishing. He said: "The several acts of assembly declaring these rivers to be highways, and regulating the fisheries in them, are incompatible with the common law right. But the common law principle concerning rivers, even if extended to America, would not apply to such a river as the Susquehannah, which is a mile wide, and runs several hundred miles, through a rich country, and which is navigable, and is actually navigated by large boats. If such a river had existed in England, no such law would have ever been applied to it. Their streams, in which the tide does not ebb and flow, are small." It appears from the opinion of BRACKENRIDGE, J., that the grants sometimes extended to the water, and called for it, and even where they did so, they were held not to go to the middle of the stream; nor did they go *to* the water, unless the grant was explicit.

This case was followed by *Shunk* v. *Schuylkill Nav. Co.*, 14 S. & R. 71, in 1826; *Bird* v. *Smith*, 8 Watts, 434; *Union Canal Co.* v. *Landis*, 9 Watts, 228, in 1840; all of which recognize the same doctrine. There does not seem to have been advanced in Pennsylvania, a claim to the centre of these large rivers, nor even to the shore. Two of the above cases, arise on claims to the exclusive right to fish with seines in the pools made or kept in order by individuals, founded upon a supposed ancient usage. But the claim of such a right was rejected.

North Carolina, also, in 1828, set aside the common law rule, as inapplicable. And the only thing which gives the riparian owner, in that state, a right down to the water, is the express declaration of their ancient acts of 1715 (or 1765) and 1777, relating to surveys and sales; and their otherwise total exemption from the common law private rights, stands upon the ground that they are declared to be highways, as the acts and laws of the United States have declared other rivers. Tennessee follows the decision in North Carolina, as subject to the same acts of assembly.

In the case of *Cates* v. *Wadlington*, 1 McCord, 583 (356 top), in 1822, the Supreme Court of South Carolina, by NOTT, J., says, "But that rule (the common law) will not do

McManus v. Carmichael.

in this state, where our rivers are navigable several hundred miles above the flowing of the tide." And they say this in close connection with the assertion, that there is no legislative act declaring which, or whether any, of their rivers are to be considered as public or navigable, so that the subject was free from any kind of constraint, except the common law rule.

The subject received more elaborate attention in *The Mayor, &c., of Mobile* v. *Eslava*, 9 Porter, 578, in 1840, than in nearly any of the other causes; and it is here viewed with more reference to the ordinances and laws of the United States, which are scarcely alluded to in any one of the foregoing cases, but without which, we conceive it impossible to reach the merits of the question. The common law rule alone seems to have absorbed the attention, in the consideration of the cases, whilst the treaties, ordinances and laws of the United States, have been overlooked or passed by in silence.

The United States provided that the navigable waters within the state of Alabama, should forever remain public highways, free to the citizens of said state and of the United States, &c., in like manner as in the ordinances relating to all the other new states. The court, in the above cause, arrive at the following conclusions:

1. The navigable waters within the state have been dedicated to the use of the citizens of the United States, so that it is not competent for Congress to grant a right of property in the same.

2. The navigable waters extend not only to low water, but embrace all the soil that is within the limits of high-water mark.

3. By the acts of Congress regulating the survey and disposal of the public lands, the federal government has renounced the title to the navigable waters and the soil covered by them.

4. That, as the original states are entitled to the right of property in the navigable waters within their territory, so Alabama, being admitted into the Union on an equal foot-

ing with the original states, is, of consequence, entitled to the same property in her navigable waters, and the soil under them.

5. By the admission of Alabama into the Union, without a reservation of the right of property in the navigable waters, the state succeeded to all the right of the United States, except so far as it was reserved by the federal constitution, in some of its grants, or its retention was necessary to enable the federal government to exercise its delegate powers.

In the opinion of the court, they hold the following language: "The several acts of Congress regulating the survey of the public lands, all provide for the surveys which border on navigable streams, to be so made as not to include within their lines any part of the shore. 1st Vol. Land Laws (ed. 1838) 50, 96, 104, 191." And again; "We find it is also enacted, in the territorial ordinance, and the laws regulating the survey and sale of lands in Mississippi and Alabama, that the navigable waters shall be and remain public highways. Here were express avowals by Congress, that they should not be surveyed and sold, but should be withdrawn from commerce." "It is then considered clear, that the navigable waters of this state have been dedicated to the common use of the people of the United States; but perhaps it may be considered as questionable, what extent of soil is embraced by the dedication. We think it must be so much ground as is covered with the water, not only at low, but at high tide. The government surveys extend thus far, and the shore is regarded rather as a part of the water, than as land. It is believed that there is no instance in which the United States, after having sold the land to high water, has afterwards asserted a right to dispose of the space between that and low-water mark." The land in question in the above cause, is adjacent to the city of Mobile, in the Mobile river. That the tide flows there, we infer, but this fact is barely alluded to incidentally. It does not form the ground for any of the reasoning of the court, nor the turning point for any of its conclusions. The whole case, with all the views of the court, is as appropriate to the Mississippi

river, along the borders of Iowa, as to the Mobile in Ala-bama. Here alone, and for the first time, has the proper force been given to the repeated dedications of navigable waters to the public of the United States. And it seems utterly inconsistent with these acts of dedication, and with the laws, to give the public only a qualified, partial, re-stricted use—a mere easement over the waters. See 16 Pet. 235–247; *Polland's Lessee* v. *Files*, 2 How. 592.

The case of *La Plaisance Bay Harbor Co.* v. *City of Monroe, in Michigan,* Walker's Ch. 155–168, in 1843, holds the same doctrine. The language of the court is: "The complainants do not own either the bed or the banks of the river below the point of obstruction. The bed of the stream is public property, and belongs to the state. This is the case with all meandered streams, no part of them being included in the original survey; and the common law doctrine of *usque ad filum aquæ,* is not applicable to them. The public owns the bed of this class of rivers, and is not limited in its right to an easement, or right of way only. So with regard to our large lakes, or such parts of them, as lie within the limits of the state."

Probably all of the cases from the state courts upon this subject, have been referred to by the counsel, whose indus-try has opened the cause to a free examination; and all of a leading character, so far as we have been able to obtain them, have been examined. It is now necessary to see how far the matter has been discussed or settled by the federal courts.

*Tyler* v. *Wilkinson,* 4 Mason, 397–400, related to the Paw-tucket river, a small river flowing in part of its course be-tween Massachusetts and Rhode Island; but the controversy was between individuals. Judge STORY, without any discus-sion, assumes the application of the common law rule to that part of it which was above the tide water.

*Bowman's Devisees and Burnly* v. *Wathen et al.,* 2 McLean, 376, is cited on both sides of the question, but we think it a strong authority against the application of the common law rule. Judge MCLEAN says: "We apprehend that the

common law doctrine as to the navigableness of streams, can have no application in this country; and that the fact of navigableness does in no respect depend upon the ebb or flow of the tide. On navigable streams, the riparian right, we suppose, cannot generally extend beyond high-water mark." The doubt as to the application of this case, as an authority, arises on the next passage, in which he says, " But in the present case, this inquiry is not important. It is enough to know that the riparian right on the Ohio river extends to the water," and that " the proprietor has the right of fishing, of ferry, and every other right which is properly appurtenant to the soil." The doubt is, whether the learned judge means this latter as a proposition holding true of the Ohio generally, or of grants standing, as the one before him did. He may have intended it of the Ohio generally, upon the strength of the cases before cited from that state; but strong against this construction, is the assertion that the proprietor has the right of fishing! Now, no one has ever gone so far as to claim a several fishery in that, or any other of the great western rivers; and the Ohio cases, as well as *Handly's Lessee* v. *Anthony*, 5 Wheat. 374, negative such a right; for they hold that as the state of Ohio extends to low-water mark only, of consequence no grant by, or in, the state, can extend farther; and the right of a several fishery implies, *ex necessitate*, a title or right *usque filum aquæ.* There is a view which renders Judge McLEAN's remarks entirely harmonious; that is, considering his last remark as made in reference to the right or title before him. For, directly, in connection with the foregoing thought, he proceeds thus: " In coming to this conclusion, we have deemed it unnecessary to look particularly into the laws of Virginia, under which the title in question was derived," &c. " The title of Isaac Bowman (one of the complainants) was derived from the state of Virginia, not only before Indiana was known as a territory, but before the organization of the Northwestern Territory. His rights, whatever they were, can have been in no respect affected by the direct act of the territorial government, or of the state government which

succeeded it." On page 377, in the statement of facts, is the following, which forms the basis of the case. The complainants claim under Isaac Bowman. "Bowman was attached to the regiment commanded by George Rogers Clark, and to whom the state of Virginia granted 150,000 acres of land, lying northwest of the river Ohio. In the cession of lands to the United States, north of the Ohio river, by the state of Virginia, this tract was reserved." Now it is difficult to apply Justice McLEAN's remarks to aught but this title and this state of things; and so viewing it, the case remains as one against the application of the common law rule even to the Ohio river. And if it is not to be so regarded, the case is still one against such application to any other of the great streams. The case of *Handly's Lessee* v. *Anthony*, 5 Wheat. 376, teaches nothing on the question before us. It was ejectment in the federal court in Kentucky, for land claimed by the plaintiff under a grant from the state of Kentucky, and which the defendant claimed under a grant from the United States, as being a part of Indiana. It was a piece of land near or on the Indiana shore, which was an island when the water was at a full or middling flow, but was left connected with the Indiana shore at low water. Chief Justice MARSHALL said: "The title depends upon the question whether the lands lie in the state of Kentucky, or in the state of Indiana," and the court held, that the state of Kentucky extended to low-water mark only, on the western or northwestern side of the Ohio. This was by virtue of the cession from Virginia to the United States.

The cases of *The City of Cincinnati* v. *White*, 6 Pet. 432; *Barclay* v. *Howell's Lessee*, 6 Pet. 499; *The City of New Orleans* v. *United States*, 10 Pet. 662, which have been cited, afford us no specific assistance. But time will not permit us to examine them.

The case of *Pollard's Lessee* v. *Hagan*, 3 How. 213, however, does contribute to our views, in that it holds that, "the shores of navigable waters, and the soils under them, were not granted by the constitution of the United States, but were reserved to the states respectively; and the new states

have the same rights, sovereignty and jurisdiction over this subject, as the original states." And McKINLEY, J., in delivering the opinion of the court, says, page 229: "Then to Alabama belong the navigable waters and the soils under them, in controversy in this case, subject to the rights surrendered by the constitution to the United States." And again, page 230: "To give to the United States the right to transfer to a citizen, the title to the shores and the soils under the navigable waters, would be placing in their hands a weapon, which might be •wielded greatly to the injury of state sovereignty, and deprive the state of the power to exercise a numerous and important class of police powers." The above cause is re-examined and affirmed in *Goodtitle* v. *Kibbe*, 9 How. 471, where it is again held, that the title to the soil below high-water mark, in navigable waters, is in the state.

The case of *Howard* v. *Ingersoll et al.*, 13 How. 381, does not bear upon the present question. The plaintiff's land had "for its eastern boundary the state of Georgia," as the bill of exceptions reads. And WAYNE, J., in the opinion, says, "The point for decision is one of boundary between the states of Georgia and Alabama." It related to the river Chattahoochee, which is believed not to be navigable in any sense in that part. At least, the question of its navigability does not enter into the case at all.

We desire to add a passage from the opinion of Chief Justice TANEY, in the case of the *Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, in 1851, in which case was considered the question of the extension of the admiralty jurisdiction of the United States to navigable waters, other than the tide waters. "Now there is nothing," he says, "in the ebb and flow of the tide, that makes the waters peculiarly suitable for admiralty jurisdiction, nor anything in the absence of a tide, that renders it unfit. If it is a public navigable water, on which commerce is carried on between different states or nations, the reason for the jurisdiction is precisely the same; and if a distinction is made on that account, it is merely arbitrary, without any foundation in rea-

son; and, indeed, would seem to be inconsistent with it. In England, the writers and courts always speak of the jurisdiction as confined to tide water. And this definition, in England, was a sound and reasonable one, because there was no navigable stream in the country, beyond the ebb and flow of the tide, nor any place where a port could be established to carry on trade with a foreign nation, and. where vessels could enter or depart with cargoes. In England, therefore, tide water and navigable water, are synonymous terms, and tide water, with a few small and unimportant exceptions, meant nothing more than public rivers, as contradistinguished from private ones; and they took the ebb and flow of the tide as the test, because it was a convenient one, and more easily determined the character of the river. At the time of the adoption of our constitution, the English definition was equally proper here. In the old thirteen states, the far greater part of the navigable waters are tide waters, &c. * * * * The courts of the United States, therefore, naturally adopted the English mode of defining a public river, and consequently the boundary of admiralty jurisdiction. They measured it by tide water. And that definition, having found its way into our courts, became, after a time, a familiar mode of describing a public river, and was. repeated as cases occurred, without particularly examining whether it was as universally applicable in this country as in England. If there were no waters in the United States which are public, as contradistinguished from private, except where there is tide, then unquestionably, here as well as in England, tide water must be the limit of admiralty power. And as the English definition was adopted in our courts, and constantly used in judicial proceedings, and forms of pleading, borrowed from England, the public character of the river was in process of time lost sight of, and the jurisdiction of the admiralty treated as if it were limited by the tide. The description of a public navigable river, was substituted in place of the thing intended to be described. And under the natural influence of precedents and established forms, a definition, originally correct, was adhered to and

acted on, after it had ceased, from a change of circumstances, to be the true description of public waters."

This large portion of attention has been given to the subject, from a conviction that the common law rule is not applicable to the Mississippi river; and because the subject has not been discussed as it should be; the courts assuming the old rule, in many cases, *sub silentio.* By thus reviewing it, we trust that it has been made manifest that less weight is to be given to the old rule, than the mind would, at first, suppose, and that the way has been opening for its entire rejection from the noble waters of the west. It cannot be doubted, that by the common law, the riparian proprietor on navigable waters owned to high-water mark only. 2 Woolrych on W., 40–44; Angell on T. W., 22–24; *Chapman* v. *Kimball,* 9 Conn. 40, and authorities cited on 38.

What, now, is to carry us down to low water? The plaintiff himself holds, that the common law rule is not applicable in its whole extent. And well he does so, for it would take away his island. But why shall we go to low water? Is this common law? and if it is not, what law is it? It is apprehended that there is no such rule or principle, and that the instances where such a rule was adopted, were dependent on certain local circumstances. *Chapman* v. *Kimball,* 9 Conn. 38, stands upon a local common law or usage. The court announces the rule to be, that owners on navigable rivers own to high water, and no further; and that their local common law gave a right ·to build wharves, &c. In North Carolina and Tennessee, the statute makes this the line. *Blanchard* v. *Collins,* 11 O. 138, as well as the case in Indiana, was probably influenced by the fact, that that line was the bound of the state, as one of the cases intimates; and beyond question, *Howard* v. *Ingersoll,* 13 How. 381, was influenced by a similar fact; that is, by the line between Georgia and Alabama, which places the party's bound on the top of the bank of the Chattahoochee.

One or two cases must be noticed, in order to show that they have not been overlooked. *Emans* v. *Turnbull,* 2 Johns. 313, is probably substantially answered by the doc-

trine in *Gould* v. *Hudson River R. R. Co.*, 2 Seld. 522, which holds that the riparian owner on the Hudson river, has no property in the shore between high and low water, entitling him to compensation when the state authorized the company to construct a road along the shore. And though the answer should not be deemed complete, still the former case could not be permitted to control the conclusion in the present one.

The case of *Blundell* v. *Catterall*, 5 B. & Ald. 268 (7 E. C. L. R. 91), cannot be passed in silence. It is a strange case, and much more, it is conceived, has been made of it than it warrants. All that was decided upon the question of the common law right, was clearly extra-judicial, and it sets up a doctrine which probably would not be listened to in this country; that is, that there is no common law right to bathe in the sea! The case is doubted and dissented from in many others, and an English writer, Hall, in his treatise on the rights of the crown, &c., finds much fault with it. The case finds that the lord of the manor, was the owner of the shore down to low water, and therefore it was, that the defendant had not the right to go over the shore with horses and carriages, and bathing machines, to the shore, for the purpose of bathing; and the judges in their several opinions, say that this is the only question, yet they go on to decide a much broader one, which was not involved. In its fullest extent, it does not help us to a conclusion on the present question. It would be extremely ungrateful to be obliged to determine a question of so much consequence as the one before us, upon the unreasoned, imperfect, and merely local views of some of the eastern cases, and upon what are no more than *obita dicta*. The only two cases relating to our large rivers, which seem to stand upon the common law rule, are *Middleton* v. *Pritchard*, 3 Scam. 510, and *Morgan* v. *Reading*, 3 S. & M. 366, which have the merit of carrying out the common law rule consistently, and not breaking it to pieces, and making a new one.

Although it should be that we have erred in the views taken of the foregoing cases, still we feel constrained to

McManus v. Carmichael.

think, that in all that has been done in relation to this great river, it was intended to set it free from all trammels and technicalities, and to make it a highway, and public, in a sense correspondent with the magnitude of the stream, and of the public interests therein. And all the reasoning which drives back the private owner from the middle of the stream, and demands an absolutely public water and bed to low water, demands the same, precisely, up to high water. It is difficult in the extreme, to find the reasoning, if such there be, which departs from the common law rule as to the thread of the stream, and then stops at low water. The common law knows but two lines, the *filum aquæ*, and high water. If the stream be navigable, the owner's bound is the one; if not navigable, his bound is the other; and although there is some naked authority in favor of dividing between them, there is none based upon legal rule or reasoning. By this review, it is perceived, that force and effect is to be given to various facts, circumstances, and considerations, which are scarcely alluded to in some of the cases, and which have no place at all in the older and eastern cases; such are the treaties, compacts, ordinances, and constitutions; the laws relative to the survey and sale o the public lands; the declaration that these rivers shall forever remain highways, free to all citizens, &c. And we find that the fact of the government selling islands separate from, and independent of, the mainland, had its weight at an early stage of the argument, in Pennsylvania, and even in New York. The fact, also, that the Mississippi river is the boundary between numerous, independent states, is of great importance, as we have found the cases recognizing the idea, that where a river is the boundary between nations and states, the common law rule does not apply. All these, and such considerations, formed absolutely no part of the older cases, and enter much less into some of the later ones, than they should. But, under these views, and with a thought of how the terms "public highway" and "navigable," are a hundred times used in relation to these rivers, how is it pos-

sible to clothe them with the narrow, straightening garments of a technical reasoning?

When the Mississippi river was declared a public highway, in the solemn instruments before referred to, it was not in any technical sense, but in a high, broad, and free understanding; and it was placed upon the same ground with a river navigable at common law. And as we cannot take the *medium filum* as our line, we think we are obeying the settled rules of law, in considering the stream as declared a navigable river in the legal sense, and as subject to the consequences which attach to such waters at common law. The conclusion, therefore, is that plaintiff has not a title to the land between high and low water, so as to enable him to maintain this action for taking the sand. This opinion need not preclude the idea, that the adjacent owner may have some rights between high and low water, which are even peculiar to himself, and not common. Nor does it necessarily determine the question of the right to make wharves or structures for the convenience of navigation and commerce, and other questions of a similar nature. Nor are municipal powers affected; nor does it imply an unbounded license, on the other side, for every one to do what he pleases, even to the detriment of the owner; nor for an unlimited occupation of the shore.

The maxim, *sic utere tuo ut alienum non lædas*, still holds; and the powers of an action on the case, of indictment, and injunction, still remain.

The judgment of the District Court is reversed, and a writ of *procedendo* will issue accordingly.