# IN THE COURT OF APPEALS OF IOWA

_____

No. 25-2005
Filed February 11, 2026

_____

**In the Interest of S.H., Minor Child,**

**M.T., Mother,**
Appellant,

**W.H., Father,**
Appellant.

_____

Appeal from the Iowa District Court for Woodbury County,
The Honorable Kristal Phillips, Judge.

_____

**AFFIRMED ON BOTH APPEALS**

_____

Molly Vakulskas Joly of Vakulskas Law Firm, P.C., Sioux City,
attorney for appellant mother.

Marchelle M. Denker of Juvenile Law Center, Sioux City,
attorney for appellant father.

Brenna Bird, Attorney General, and Michelle R. Becker,
Assistant Attorney General, attorneys for appellee State.

Maxine Buckmeier, Sioux City,
attorney and guardian ad litem for minor child.

_____

Considered without oral argument
by Tabor, C.J., and Badding and Langholz, JJ.
Opinion by Tabor, C.J.

**TABOR, Chief Judge.**

A mother and father separately appeal the termination of their parental rights to their toddler daughter, S.H.[1] We find the State presented clear and convincing evidence that the child cannot be returned to their custody and it serves her best interests to terminate their parental rights.

The disturbing prelude to this case occurred in 2019 when the father pleaded guilty to second-degree manslaughter for the death of his two-month-old daughter in Minnesota. After drinking and smoking marijuana, he put a heavy quilt over the crying infant's face, suffocating her. Because of the father's drug use and criminal history, the Hennepin County Department of Health and Human Services were already involved with the family. The father voluntarily terminated his parental rights to two other children.

Moving to this case. S.H. was born in March 2024. The Iowa Department of Health and Human Services intervened from the start because of the father's history. Plus, current events were concerning. The mother tested positive for methamphetamine. The father tested positive for THC but had a medical marijuana card and said he didn't smoke around the baby. The juvenile court adjudicated S.H. as a child in need of assistance (CINA), and the parents agreed to a safety plan and voluntary services.

That spring and summer held more trouble for the family. The department received two tips that they were using drugs, but investigations did not confirm the reports. In July, a hair stat test on S.H. was positive for methamphetamine and THC. The parents agreed to stay with a cousin as

---

[1] We review termination-of-parental-rights proceedings de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (citation omitted).

part of another safety plan, which broke down almost immediately. The court approved S.H.'s removal from her parents, and the department placed her in foster care. The parents' participation in services and visitation was mixed at best. They attributed their mediocre performance to turnover in their service providers and difficulties scheduling around their jobs. Communication and transportation were also obstacles. And the parents were not always truthful with the department or service providers.

Fast forward to fall 2025. The parents had an apartment and jobs. The mother completed substance-use treatment and had all negative drug tests. The father participated in a few court-ordered therapy sessions. Meanwhile, S.H. remained with her foster parent. At the time of the termination hearing, S.H. was about eighteen months old.

Although S.H. appeared healthy at birth, over the year that she was out of parental custody, her dire medical condition revealed itself. At the termination hearing, her foster mother testified in detail about the child's potentially life-threatening diagnoses, the precariousness of her day-to-day health, the medications she takes and treatments she undergoes, and the need for careful daily monitoring of her symptoms.

The foster mother also testified that the parents rarely attended S.H.'s medical appointments. She estimated out of more than fifty appointments in the last year, the parents attended less than ten, either in person or virtually, despite the foster mother calling them at every appointment. The foster mother also offered the parents rides to S.H.'s appointments, which were sometimes in Sioux Falls or Omaha. The parents' unfamiliarity with their child's serious medical condition came through in their testimony. Neither parent could identify the host of S.H.'s health concerns, her providers,

medications, necessary medical equipment or how to use it, nor the signs to watch for that required immediate medical attention.

After absorbing that telling testimony, the juvenile court terminated both parents' rights under Iowa Code section 232.116(1)(h) (2025). They appeal separately.

We review termination proceedings in three steps. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). First, we evaluate whether the State has proven a statutory ground under Iowa Code section 232.116(1). *Id.* Second, we assess whether terminating parental rights is in the child's best interests under section 232.116(2). *Id.* Third, we consider whether any exceptions in section 232.116(3) preclude termination. *Id.*

The parents object to termination under section 232.116(1)(h).[2] They argue the State presented insufficient proof of the fourth element, which requires clear and convincing evidence that the child cannot be returned to parental custody at the present time as provided in section 232.10.[3] Iowa

---

[2] Much of the termination hearing focused on the department's reasonable efforts to reunite the family. *See* Iowa Code § 232.102; *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). The State bears the burden of showing the department made "reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *In re S.O.*, 967 N.W.2d 198, 209 (Iowa Ct. App. 2021) (citation omitted). In February 2025, the juvenile court found the department failed to make reasonable efforts for the family in October, November, and December 2024, due to "issues with the provision of the family centered services, including visitation." In the same order, the court found the department corrected the concerns. And at termination, the court again found the department made reasonable efforts. On appeal, neither parent reprises their reasonable-efforts challenge.

[3] Our caselaw offers two formulations for what it means when a child "cannot be returned" to parental custody as provided in section 232.102, which discusses transferring the child's custody if staying in the home would be "contrary to the welfare of the child."

Code § 232.116(1)(h)(4); *In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (finding "at the present time" means the date of the termination hearing).

The mother argues she is sober, has a stable home, and is ready to provide "the minimal level of care" required to resume custody of S.H. The father also points to their "appropriate housing" and his positive interactions at visitation. Both parents cite their lack of financial resources as a barrier and argue it shouldn't prevent the court from returning S.H. to their custody.

True, the mother allayed concerns about her drug use by completing treatment and demonstrating her sobriety with negative drug tests. But the biggest roadblock to reunification at the time of termination hearing was the parents being ill-prepared to handle S.H.'s complex medical condition. They insist that they didn't need to know her medications or use her equipment during their visitation hours. Yet it was knowledge about their daughter they should have gleaned by attending her doctor's appointments or asking for updates from the foster parent. But whether the parents lacked the interest or the aptitude, they did not ready themselves to take over her care. They also could have improved their understanding of her medical needs by working toward unsupervised or overnight visitation. That never happened because they were inconsistent with attendance until just before termination when visits were moved to their home.

In contesting termination, the parents complain that the department has been unfair to their family through "moving of the goal post" during the

---

*See In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) (holding child cannot be returned if return exposes child to "any harm amounting to a new [CINA] adjudication"); *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *1–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases specifying an inability to "safely return" children to the parents' care). Under either formulation, the State met its burden of proof here.

CINA proceedings. But the reality is that S.H.'s serious medical needs emerged over time. And the parents failed to rise to the occasion. Our cases commonly consider parents' ability to deliver reliable care to children with unique medical needs. *See*, *e.g.*, *In re J.H.*, 952 N.W.2d 157, 170 (Iowa 2020) (upholding termination when young child had serious medical needs but father was "content to sit back and let others care for J.H."); *In re J.M.*, No. 25-1570, 2025 WL 3654271, at *3 (Iowa App. Dec. 17, 2025) (citing child's complex medical condition and parent's failure to attend doctor's appointments in support of termination). Here, we doubt whether either parent could respond appropriately to the evolving demands of S.H.'s health, especially in an emergency. Because her condition remained fragile, and the parents were not equipped to handle her situation, we find clear and convincing evidence that S.H. could not be returned to their custody at the time of the hearing.

The same concerns inform the parents' second contention. They contend it is not in S.H.'s best interests to terminate their rights. At this step, Iowa Code section 232.116(2) requires us to consider the child's safety as well as the best placement for furthering her long-term nurturing and growth, including her physical, mental, and emotional condition and needs. S.H. has been out of her parents' care since she was four months old. In that time, the parents have succeeded in some regards. And no doubt they love their child. But their inaction surrounding her serious medical needs provides clear and convincing evidence that they would not be a safe option to promote her short- or long-term nurturing and growth.

**AFFIRMED ON BOTH APPEALS.**